794 So.2d 45 (2001)
NISSAN NORTH AMERICA, INC.
v.
ROYAL NISSAN INC. and All Star Nissan, L.L.C.
No. 01-CA-113.
Court of Appeal of Louisiana, Fifth Circuit.
May 30, 2001.
Rehearing Denied August 6, 2001.
*46 George Denegre, Jr., Shannon S. Holtzman, Liskow & Lewis Law Firm, New Orleans, LA, and Kevin A. Russel, Latham & Watkins, Chicago, IL, Counsels for plaintiff-appellant.
Herschel C. Adcock, Sr., Baton Rouge, LA, Counsel for defendant-appellee.
Court composed of Judges JAMES L. CANNELLA, SUSAN M. CHEHARDY and JAMES C. GULOTTA, Pro Tempore.
JAMES C. GULOTTA, Judge, Pro Tempore.
Plaintiff appeals from the trial court's judgment affirming a finding by the Louisiana Motor Vehicle Commission (LMVC) prohibiting Nissan North America (Nissan) from amending All Star Nissan (All Star) and Royal Nissan's ("Royal") dealership agreements by deleting one census tract in each of their Primary Market Areas (PMAs) and adding those two census tracts to a new dealer's, LeBlanc Nissan ("LaBlanc"), Primary Market Area(PMA). We affirm.
*47 In 1992, Diamond Nissan ("Diamond") and Royal Nissan ("Royal"), the two East Baton Rouge Nissan dealerships at that time, protested the licensing of a third dealership in that area, LeBlanc Nissan ("LeBlanc"). The Louisiana Motor Vehicle Commission (LMVC) approved LeBlanc's license, concluding that the two existing dealerships in the area were not providing adequate representation to customers in the southernmost region of East Baton Rouge Parish and Ascension Parish. LeBlanc constructed a dealership, and Nissan issued a license on January 23, 1995. The same day, Nissan notified Royal and Diamond that it intended to change their Primary Market Areas.[1]
Royal and Diamond objected to the change in PMAs, and filed a complaint with the LMVC. They contended that the change was unfair, amounted to a partial cancellation of dealer agreements without just cause, and was a modification in violation of La. R.S. 32:1254(R).[2] Ultimately, Royal and All Star withdrew their unfairness and partial cancellation claims, leaving only their claim of modification under 1254(S).[3]
The question, then, before the Commission, was whether Nissan had modified the dealer agreements, and, if so, whether that modification violated La. R.S. 32:1254(S), which provides that "[t]he party seeking to modify or replace an agreement must demonstrate by a preponderance of the evidence that there is good cause for the modification or replacement." (Emphasis added.)
Royal and All Star argued, again before the Commission, that Nissan lacked good cause for the change because their rights of relocation and protest were adversely impacted. The rights of relocation and protest are set forth in La. R.S. 32:1254(F). Dealers may relocate, subject to approval by the manufacturer and the Commission, within their own territories, and the dealers are denied the right of protest when located more than five miles from the proposed relocation site. Similarly, dealers may only protest the relocation of dealerships within a five-mile radius of them. According to the dealers, if LeBlanc is assigned the two disputed tracts, LeBlanc could then move his Nissan dealership to one of those tracts, which are in an economically thriving area, and are close to his Lexus and Toyota dealerships (beyond five miles from the defendant dealers) without All Star and Royal being able to protest the relocation. Additionally, neither of the older dealerships could move into the growth area without protest from Price LeBlanc.[4]
The Commission found that "[i]t [would be] unreasonable for Nissan Motor Corporation in U.S.A. to delete the East Baton Rouge Parish census tracts from the PMAs of Royal Nissan, Inc. and All Star Nissan, L.L.C." An appeal to the 24th Judicial District Court, Parish of Jefferson resulted in an affirmation by that court.
*48 On appeal, Nissan urges that: (1) the Commission assumed that Nissan's action of changing Royal and All Star's PMAs was a contractual modification; (2) Section 1254(S) may not be applied retroactively to Royal's Dealer Agreement; (3) the Commission exceeded its authority by concluding that Nissan could not change the dealers' PMAs in the exercise of reasonable discretion; and (4) the Commission's decision was arbitrary, capricious and an abuse of discretion, all of which were argued to the trial court.
An appellate court's review of a trial court's judgment pertaining to a cause of action founded in the Louisiana Administrative Procedure Act is de novo. La. R.S. 49:965; Louisiana Automotive Fin. Servs., Inc. v. Dept. of Econ. Dev., 98-0981 (La.App. 1st Cir.5/14/99), 743 So.2d 217. We, accordingly, must conduct an independent review of the relevant facts and law.
Louisiana automobile dealers and manufacturers are subject to the Distribution and Sales of Motor Vehicles Law. At the outset, we are in agreement with Nissan that Section 1254(S) of that law does not apply to its contract with Royal. As Nissan claims, Section 1254(S) was added to the Act after it formed the dealer agreement with Royal and cannot be applied retroactively. The correct standard for changes to Royal's PMA, as argued by Nissan, is found in the agreement itself: "[Nissan] reserves the right, in its reasonable discretion, to issue new, superceding `Notices of Primary Market Area' to Dealer from time to time."
Royal and Nissan executed their Dealer Agreement in 1989. Section 1254(R) was added to the Act in 1993 and revised in 1999, as Section 1254(S). The statute provides a substantive change in the law and is silent as to retroactivity. Where the legislature has not expressly indicated that a substantive statute shall be applied retroactively, it may apply prospectively only. La. Civ.Code art. 6. Accordingly, with respect to Royal Nissan, the good cause standard of Section 1254(S) is inapplicable. Thus, the standard expressed in the dealer's agreement, permitting a change from time to time, in the exercise of reasonable discretion, applies. To the contrary, All Star bought Diamond Nissan in November 1999, and pursuant to Nissan's request, signed a new dealer agreement. Because the Section 1254(R) was added prior to that agreement, Nissan may only change All Star's PMA for good cause.
Nissan claims the district court erred in assuming that Nissan's exercise of its contractual right to change the dealers' PMAs was a "modification" within the meaning of Section 1254(S). Nissan argues that, because it had an expressed contractual right to alter the dealers' PMAs in its reasonable discretion, from time to time, there was no modification; therefore, the statute, providing standards for agreement modifications, is inapplicable.
Also within this assignment of error, Nissan argues that the proposed changes to the dealers' PMAs do not substantially and adversely affect the appellees' rights, obligations, investment or return on investment, which is a threshold requirement for the application of Section 1254(S). Nissan contends the only effect the dealers have cited is an effect on hypothetical dealership relocations. Nissan further argues the authority to determine PMA boundaries lies solely with the distributor because Nissan's evaluation of each dealer's performance will be compromised by the Commission assigning territory to All Star and Royal for which Nissan believes LeBlanc should be responsible, and the commission and the trial court erred in not *49 recognizing Nissan's right to determine PMA boundaries.
Under the existing PMAs, All Star and Royal have the right to protest the relocation of another dealer in their respective tracts and have the right, subject to Nissan's approval, to relocate within those tracts. The rights to prohibit another same line dealer from moving into a census tract in an area of tremendous growth and potential and to move into that area are certainly substantial and are adversely affected when the manufacturer entirely eliminates those rights by deleting the tracts from a PMA.
Nissan takes the position that it made the modification because it was required to assign a PMA to Price LeBlanc. It determined that Price LeBlanc's PMA should consist of Ascension Parish and a specified area at the southernmost boundary of East Baton Rouge Parish by "uniformly applying the standards it uses for defining PMAs throughout the country." Nissan notes that the Commission previously determined that All Star and Royal were not adequately performing in this same area when it approved LeBlanc's license and that LeBlanc consistently outperforms the other dealerships in the disputed tracts. Sales in a dealer's PMA, according to Nissan, is the manner in which Nissan judges dealership performance.
Nissan argues that it draws PMA boundaries in the exact same manner across the entire country. Nissan claims that the dealers did not even argue that their process is discriminatory and that the Commission conceded that the process was "arguably non-discriminatory."
Nissan also claims the modification will have no adverse effect upon the dealers' investments or return on investments because dealers are free to sell vehicles to customers in any PMA.
Nissan concedes the proposed modification does not affect the public interest and that redefining PMAs is not necessary for the orderly and profitable distribution of motor vehicles by the dealer.
While it is obviously true that Nissan has the right to assign PMAs as it sees fit, that right is not absolute. When a claim is raised that the manufacturer's assignment of PMAs violates Louisiana law, the Commission and the courts are authorized to determine the right result in light of the law of this state and the terms of the contract. Because Louisiana law is clear that the Act prohibits any agreement which seeks to modify the terms of the Act, the Commission properly decided the issue instead of permitting the distributor alone to regulate its dealers.
Finally, Nissan argues that it believes the new PMAs will actually benefit the dealers, by making the sales areas smaller for which Nissan holds the dealers accountable.
All Star and Royal contend Nissan failed to meet its burden of proving by a preponderance of evidence that the change in PMAs was either done for good cause or in the exercise of reasonable discretion. They attack the data used as outdated, noting that the market study Nissan used was conducted in 1989 and based on 1980 census data, and that Nissan's market expert had not been in Baton Rouge in the last 12 years, until the week before trial. The dealers also suggest that Nissan could monitor sales performance in some other manner, such as looking at new car registrations, to which the dealers state that Nissan's market expert conceded.
In this connection, Nissan employees, John Busch and Ken Lobert, testified at the hearing before the Commission. Busch, a market planner, employed with Nissan for 21 years, conducts in house *50 market reviews, in house market studies, and infield market studies. While he performs the in house market reviews and the in house market studies, as the names imply, at Nissan's headquarters, he performs infield studies in the actual markets. There, the employees spend a week to two weeks studying the markets by conducting timed drives and taking photographs of all competitive dealerships. Additionally, they look at the demographic information and registrations, gathered from in house market studies.
Busch testified that he has conducted approximately 150 infield market studies throughout the country, in areas such as Los Angeles, New York, Dallas Fort Worth, Houston, Chicago, Philadelphia, Minneapolis St. Paul, and in the Shreveport, New Orleans and Baton Rouge markets in Louisiana. After each study is conducted, Busch makes recommendations to the dealers of renovations and expansions, and defines and analyzes emerging markets.
Also as part of his duties, he draws primary market area boundaries. Busch explained that he draws the boundaries by conducting timed drives between existing Nissan dealers and the proposed new market area, to determine shopping patterns and retail draws. The goal of drawing PMA lines, according to Busch, is to allow Nissan to determine the correct area of responsibility for a certain market. The PMAs are divided into census tracts, which he describes as the "most accurate level of data collection from both registrations and the demographic perspective." This breakdown allows Nissan to know the "overall performance market penetration and demographics of a particular market." In drawing PMAs, he testified that Nissan does not take into account protest rights but does consider relocation rights, if there is a state statute that affects those rights.
Busch participated in drawing the Gonzales PMA. He explained that he conducted an infield study in 1989, where he performed timed drives from Diamond to Royal and from Royal to the new growth area, to substantiate the boundaries as previously drawn in 1984. He learned from those timed drives that Airline Highway was highly congested, and that it seemed people would be more willing to drive farther south, than to fight the traffic north, which he claimed was substantiated by the fact that a Gonzales Toyota dealer had a substantial amount of sales. Busch also reviewed logical shopping patterns, which, according to Busch, supported the conclusion that the southern part of the region had the most growth. He did not, however, consider how the redrawing would affect dealers' relocation rights. Based on this study, Busch drew the Gonzales PMA, which consisted of six census tracts, based on the 1980 census, including two tracts in southernmost Baton Rouge, which were then part of Royal and Diamond's PMAs.
In 1990, after reviewing the market data again in 1989, a sales directional map was created to helped plot the sales directionally, based on percentages. According to the witness, Royal and Diamond did not sell as many units in the southwest and southeast areas of the region as they did in the northwest region.
Once the witness defined the PMA, it was used to determine the registration base, demographic base, population base and demographic changes in the market. He did not make any assumption as to who the dealer would be in that area, and stated that the method by which he defined the Gonzales PMA was the same method he used in nearly 150 other markets.
In connection with LeBlanc's application for a dealers' license, Nissan advised the Commission of the proposed PMA. When *51 that notice was given in 1995, there were then nine census tracts in the area, because the 1990 census reflected population increases, though the boundaries of the Gonzales PMA remained the same. For the purpose of the Commission's hearing in May 2000, the witness analyzed all three dealers' vehicle sales in the entire nine tract area, as well as specifically in the two tracts in dispute. The witness explained that LeBlanc did not have a full year of sales in 1995, because he opened the dealership in late January, and similarly, the 1996 data was not truly reflective of LeBlanc's productivity because 1996 was a start-up year, where the focus was primarily on advertising. According to the witness' data, Royal registered more cars and trucks in the nine-census tract area in 1995 and 1996, but LeBlanc has led from 1997 to present. Because of these sales figures, according to the witness, he determined that he properly drew the Gonzales PMA 11 years earlier to include those tracts. After analyzing sales data specifically in the two disputed tracts, the witness concluded that in Royal's tract, Diamond was the top seller in 1995; Royal was the top seller in 1996, and LeBlanc was the top seller from 1997 to the present. In Diamond's tract, LeBlanc was the top seller from 1995 to present. According to the witness, this data, too, supported the way he drew the Gonzales PMA in 1989.
A week and a half before trial, the witness visited the Baton Rouge market for the first time in 12 years. He observed that the growth areas are where he thought they would be, in southernmost East Baton Rouge parish and in Ascension Parish, where the City of Gonzales is located. He stated that he would return sometime after the 2000 census data is released in June 2001 to conduct another in field market study, by doing timed drives, and using sales data and registration, if there is a question of which tracts should be included in which PMAs.
Ken Lobert, a dealer's operation manager with Nissan, also testified at the hearing. Lobert is primarily involved with vehicle sales and marketing. He testified that Nissan uses PMAs to evaluate dealer performance within a specific geographic area.
According to Lobert, because, at the time of the Commission's hearing, LeBlanc did not have a PMA, he had not been able to accurately evaluate its performance, or the performance of the other two dealers. And it is his opinion that if LeBlanc was assigned to the Gonzales PMA, both Royal and All Star's sales figures would increase because they are not selling well in that area.
As previously determined, the statutory good cause standard for changing dealer's primary market areas is only applicable to All Star's dealer agreement, not to Royal's. Because no statutory standard existed in 1989, when Nissan and Royal executed that dealer agreement, the contractual standard, allowing changes in Nissan's exercise of reasonable discretion, applies.
We, therefore, determine whether Nissan proved, by a preponderance of the evidence that good cause existed for changing All Star's PMA and whether reasonable discretion existed for changing Royal's PMA, at the time the changes were made. Though the studies were conducted beginning in 1989, reflecting the need for a third PMA, and supporting the drawing of the Gonzales PMA as it now exists, the actual change did not occur until 1995, when Nissan submitted the PMA change to the Commission. By that time, Nissan had conducted the study and had established the sales directional map, both five to six years before the change. Importantly, Nissan did not conduct any other studies in that five-year period *52 prior to the change. And Nissan's best evidence of why it was necessary to change the PMAs of existing dealers was that LeBlanc Nissan had to be assigned a PMA and that, in 1989, Busch observed "quite a bit of traffic on Airline Highway and... a substantial amount of Toyota sales in the Gonzales area."
Since the decision to change PMAs, and presumably in preparation for the hearing, Nissan analyzed sales data to prove, in retrospect, that it made the correct decision to reassign the two disputed tracts to LeBlanc. Though it is persuasive, sales data gathered five years after the PMA change is not determinative of whether there was good cause or a reasonable exercise of discretion to make a change five years prior.
Additionally, though Busch conceded that Nissan factors in relocation rights, if provided in a state statute, when determining whether to change PMAs, nothing indicates that Nissan did so here. Louisiana dealers' relocation rights are statutorily limited. By changing these dealers' PMAs, Nissan has eliminated their ability to relocate, without protest, into tracts of tremendous growth. The fact that Nissan did not consider that right in its decision to change the dealers' PMAs is significant.
Based on our consideration of the evidence before the Commission, the trial court and now before this court, we conclude that Nissan failed to overcome its burden of proving, by a preponderance of evidence, that it had good cause to alter All Star's dealership agreement. Though Nissan was not required to demonstrate good cause by a preponderance of evidence to change Royal's agreement, it, nonetheless, was required to prove that its discretion was reasonable. We also find that, for the same reasons we found failure to demonstrate good cause by a preponderance of evidence with respect to All Star, Nissan did not exercise reasonable discretion in altering the terms of Royal's dealership agreement.
Accordingly, we affirm the trial court's judgment, which adopted the Louisiana Motor Vehicle Commission's decision, and conclude that Nissan is prohibited from deleting the disputed census tracts from the Primary Market Areas of Royal Nissan and All Star Nissan, respectively.
AFFIRMED.
NOTES
[1] Generally, Primary Market Areas are the areas of performance responsibility for dealers. Nissan evaluates its dealers based on sales in those areas. Each dealer agreement with the distributor outlines that dealer's area of responsibility, or PMA.
[2] All Star purchased Diamond's dealership assets and facilities in November 1999, and thereafter, on March 30, 2000, intervened in the complaint before the Commission. Diamond was dismissed from that complaint.
[3] Section 1254(R) was revised in 1999 to become Section 1254(S).
[4] Currently, All Star and Royal could relocate into their respective tracts in southernmost East Baton Rouge and could protest LeBlanc's relocation there.