885 So.2d 654 (2004)
MARLER FORD COMPANY, INC.
v.
FORD MOTOR COMPANY and State of Louisiana through the Louisiana Motor Vehicle Commission.
No. 04-CA-342.
Court of Appeal of Louisiana, Fifth Circuit.
October 12, 2004.
Rehearing Denied November 18, 2004.
*655 Henry B. Bruser, III, Barbara Weems Melton, Gold, Weems, Bruser, Sues & Rundell, Eugene A. Ledet, Jr., Rivers, Beck, Dalrymple & Ledet, Alexandria, LA, William P. Connick, Craig V. Sweeney, Connick & Connick, L.L.C., Metairie, LA, Timothy J. Falcon, Marrero, LA, for Plaintiff/Appellant, Marler Ford Company, Inc.
George J. Denegre, Jr., Liskow & Lewis, New Orleans, LA, Thomas W. Curvin, Carla W. McMillian, Sutherland Asbill & Brennan LLP, N.E. Atlanta, GA, for Defendant/Appellee, Ford Motor Company.
Panel composed of Judges MARION F. EDWARDS, SUSAN M. CHEHARDY and WALTER J. ROTHSCHILD.
SUSAN M. CHEHARDY, Judge.
This appeal arises in an administrative proceeding before the Louisiana Motor Vehicle Commission ("the Commission"), in a *656 dispute between an automobile dealer and the dealer's manufacturer. The Commission ruled in favor of the manufacturer and the district court upheld the Commission's judgment. We affirm.
Marler Ford, Inc. ("Marler") sought a ruling from the Commission that Ford Motor Company ("Ford") violated La.R.S. 32:1254 by insufficiently reimbursing Marler for warranty work and by threatening to impose a surcharge on vehicles sold in Louisiana.[1]
Under the franchise agreement between Ford and Marler, called the Sales and Service Agreement, Marler is required to perform labor and to provide parts in satisfaction of Ford's warranties to purchasers of Ford vehicles. Under both the Agreement and under Louisiana law, Ford is obligated to reimburse Marler for labor and parts used by Marler to perform warranty work for Ford.
Specifically, Marler complained that Ford fails and/or refuses to reimburse Marler for warranty work at the rate Marler charges its retail (non-warranty) customers, in that Ford uses different time standards for labor time than Marler uses and Ford requires excessive and burdensome paperwork support for Marler's part pricing. Marler also alleged that Ford attempted to induce or coerce Marler to refrain from pursuing the complaint, by threatening to increase the price of new vehicles in order to recover additional amounts Ford pays on warranty repairs.
Marler has filed these claims before the Commission three times. The first complaint, No.2001-008, was filed on October 24, 2000. Marler dismissed the complaint in order to negotiate with Ford. The second complaint, No.2001-031, was filed on August 1, 2001. At Ford's request, the matter was heard by three non-dealer commissioners, pursuant to La.R.S. 32:1253(A)(3). However, the second complaint was dismissed without prejudice as premature, because Marler had not submitted to Ford, and Ford had not denied, an actual claim for a specific warranty repair requesting payment at Marler's retail prices.
In response to that ruling, Marler submitted claims to Ford requesting reimbursement for parts used in specific warranty repairs at Marler's retail prices. Ford failed to approve Marler's claims within the statutory 30-day period required by La.R.S. 32:1254(N)(6)(o)(iv). Similarly, Marler's claims to Ford seeking reimbursement for labor utilized in warranty repairs at Marler's retail prices were denied.
Marler filed its third complaint, No.XXXX-XXXX, on October 25, 2002. By stipulation of the parties, the third proceeding incorporated the evidence, exhibits and transcripts from the second proceeding. On Ford's motion, the Commission preliminarily dismissed the portion of the complaint concerning the surcharge. After taking further evidence regarding warranty work reimbursement, the Commission rendered a decision in favor of Ford. The Commission ruled as follows:
FINDINGS OF FACT
1. Ford dealers in Louisiana are required to use the Ford Service Labor Time Standards manual for reimbursement for warranty labor.
2. It is neither unfair nor unreasonable for Ford to require dealers to use the Ford Service Labor Time Standards *657 manual for reimbursement for warranty labor.
3. Ford is paying Marler at the same labor rate for warranty work as Marler charges its retail customers.
4. Ford has a procedure in effect for dealers in Louisiana to obtain reimbursement for warranty parts at the same price charged by dealers to retail customers.
5. Ford's procedure in Louisiana for dealers to obtain warranty parts reimbursement is neither unfair nor unreasonable.
6. Marler has not been unfairly refused reimbursement for warranty parts by Ford.
CONCLUSIONS OF LAW
1. Ford Motor Company has not violated La.R.S. 32:1254(N)(6)(0).
2. Marler's claim challenging the possible imposition in the future of a surcharge on vehicles sold in Louisiana is premature, and such claim is therefore dismissed on the grounds of prematurity.
Marler appealed to the 24th Judicial District Court for the Parish of Jefferson,[2] which affirmed the Commission's ruling, and from there Marler appealed to this Court.
Marler makes the following assignments of error:
1. The district court erred in affirming the Commission's finding that Ford did not violate La.R.S. 32:1254(N)(6)(f) and 32:1254(N)(6)(o) by paying Marler at a price of rate for warranty work that is less than that charged by Marler to retail customers of the dealer for non-warranty work of like kind.
2. The district court erred in affirming the Commission's finding that Ford did not violate La.R.S. 32:1254(N)(6)(b) and 32:1254(N)(6)(e) by threatening to impose a surcharge on all vehicles sold in Louisiana should Ford be required to reimburse dealers on parts used in warranty work at retail prices.

STANDARD OF REVIEW
A person who is aggrieved by a final decision or order in an agency adjudication proceeding is entitled to judicial review in the district court, which is conducted by the court without a jury and on the record from the agency. La.R.S. 49:964(B), (F).
The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Affected by other error of law;
(5) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
(6) Not supported and sustainable by a preponderance of evidence as determined by the reviewing court. In the application of this rule, the court shall make its own determination and conclusions *658 of fact by a preponderance of evidence based upon its own evaluation of the record reviewed in its entirety upon judicial review. In the application of the rule, where the agency has the opportunity to judge the credibility of witnesses by first-hand observation of demeanor on the witness stand and the reviewing court does not, due regard shall be given to the agency's determination of credibility issues.
La.R.S. 49:964(G).
An appellate court's review of a trial court's judgment pertaining to a cause of action founded in the Louisiana Administrative Procedure Act is de novo, requiring this Court to conduct an independent review of the relevant facts and law. Nissan North America, Inc. v. Royal Nissan Inc., 01-113 (La.App. 5 Cir. 5/30/01), 794 So.2d 45, 48.

RETROACTIVE APPLICABILITY OF STATUTORY CHANGES
Before discussing the merits of Marler's claims, we must address a threshold issue raised by Ford. As an alternative ground to affirm the Commission's decision, Ford argues that La.R.S. 32:1254(N)(6)(o) and 1254(N)(6)(f) cannot be applied retroactively to the pre-existing contractual relationship between Ford and Marler. The Sales and Service Agreement between Ford and Marler was executed in 1982. La.R.S. 32:1254(N)(6)(f) was enacted pursuant to Acts 1983, No. 539, effective January 1, 1984. La.R.S. 32:1254(N)(6)(o) was enacted by Acts 1990, No. 283, effective July 5, 1990. Ford argues that the subsequently-enacted provisions cannot be applied retroactively so as to require Ford to reimburse Marler for labor and parts used in warranty repairs at rates or prices other than as set out in Section 4 of the agreement between the parties.
In support of that argument, Ford cites a case from this Court, in which we held that the applicable subsections of La.R.S. 32:1254 may not be applied retroactively to contracts between dealers and manufacturers that were in existence at the time the statutes were enacted. Nissan North Am. v. Royal Nissan, 01-113, p. 3 (La.App. 5 Cir. 5/30/01), 794 So.2d 45, 48.
That argument, however, is made moot by an act passed in the 2004 regular legislative session. Acts 2004, No. 250, § 1, effective August 15, 2004, amended the definition of "franchise" in La. R.S. 32:1252(10) to state, in pertinent part:
(10)"Franchise" means any written contract or agreement between a motor vehicle dealer ... and a manufacturer ... by which the motor vehicle dealer ... is authorized to engage in the business of selling or leasing the specific makes, models, or classifications of new motor ... marketed or leased by the manufacturer ... and designated in the franchise agreement or any addendum thereto. For purposes of this Chapter, any written modification, amendment, or addendum to the original franchise agreement, which changes the rights and obligations of the parties to the original franchise agreement, shall constitute a new franchise agreement, effective as of the date of the modification, amendment, or addendum. [Emphasis added.]
Marler asserts this change in the law was intended to overturn contrary jurisprudence, such as Nissan North America, Inc. v. Royal Nissan Inc., supra. Marler argues that this amendment is curative and procedural, because it determines that all rights and obligations created by a motor vehicle franchise agreement are subject to all Louisiana laws in effect on the date of any revision of that agreement, and because it assists in determining *659 rights and liabilities under motor vehicle franchise agreements.
We agree. Further, Marler established that between 1982, when its original agreement with Ford was executed, there have been several modifications, amendments and/or addenda to the original franchise agreement that changed the rights and obligations of the parties. Hence, the amended version of La.R.S. 32:1252(10) applies.
Accordingly, Ford's argument against applying the statutory provisions at issue in this case to Ford's agreement with Marler is moot.

WARRANTY WORK REIMBURSEMENT
The applicable statute, La.R.S. 32:1254, states in pertinent part:
N. It shall be a violation of this Chapter:
* * *
(6) For a manufacturer of motor vehicles ...:
* * *
(f) To fail or refuse to pay a franchise dealer doing warranty work under the manufacturer's published warranty a labor rate equal to but not in excess of the labor rate in effect in the particular dealership for such work when done for the public in general, i.e., nonwarranty work.
* * *
(o)(i) To fail to adequately and fairly compensate its dealers for labor, parts, and other expenses incurred by such dealer to perform under and comply with a manufacturer's or a distributor's warranty agreement.
(ii) In no event shall any manufacturer or distributor pay its dealers at a price or rate for warranty work that is less than that charged by the dealer to the retail customers of the dealer for nonwarranty work of like kind.
(iii) Warranty work includes parts and labor performed.
The dispute here arises because Marler contends that Ford does not reimburse Marler for warranty work at Marler's retail rates, as required by law. The crux of the problem lies in the manner in which Ford reimburses Marler.
For parts used in warranty repairs, Ford pays dealers a 40% mark-up above dealer cost.[3] Marler charges its non-warranty retail customers Ford's Manufacturer's Suggested Retail Prices ("MSRP") plus 10% for parts.[4] Marler states this averages approximately 92% above Marler's parts cost, so that what Ford pays Marler for a warranty part is approximately 27% less than Marler charges for that part in like-kind non-warranty repairs.
With regard to parts reimbursement, Marler's complaint in essence is that Ford's procedure is too time-consuming, burdensome and difficult to follow ("economically impossible and otherwise unworkable"). Ford's procedure for reimbursement to the dealer for parts is a "part-by-part, claim-by-claim" system. It *660 requires that, for each part used, the dealer provide documentation substantiating the price the dealer is requesting from Ford for reimbursement. The dealer must send Ford copies of the five most recent retail customer-paid repair orders in which such a part was used prior to the warranty repair date, together with a calculation of the average price charged those customers, and copies of the invoices for the sales of those parts.
Absent such documentation, Ford reimburses the dealer pursuant to Ford's Warranty Parts National Reimbursement Policy of 30%, 35%, or 40% above dealer cost, depending on model year of the vehicle.
Marler, however, wishes Ford to reimburse it based on Marler's average markup for parts sold to retail customers, calculated from 100 sequential repair orders for retail repairs.[5] The procedure Marler wishes to use is the same procedure accepted by Ford in New Jersey and Illinois. Ford contends that Marler may not use that procedure, however, because the average or estimate non-warranty price is not permitted under the "like kind" language of Louisiana's statute, whereas the statutes in New Jersey and Illinois do not contain a "like kind" requirement.[6]
Marler's president, Daniel Webb, admitted at the hearing that when the earlier complaints were filed Marler's computer system could not track parts by number. By the time of the hearing on the third complaint, Marler had a new system that was able to track part numbers on orders. Nevertheless, Webb stated, in attempting to follow Ford's part-by-part/claim-by-claim procedure, Marler's staff was unable to find five historical repair part sales on matching parts or even when using compatible part numbers. On cross-examination, however, he admitted the database being searched was limited because it consisted only of repairs made within a few months prior to the hearing since the new computer system was installed.
With regard to labor, Ford pays Marler the hourly rate that Marler charges its non-warranty customers ($65.25). What is disputed is the amount of time that should be allocated to each type of repair. Ford employs its own manual (Ford Service Labor Time Standards) to set out the time allocated for each type of repair. Marler, however, uses standards set out in another guide, the Motor Auto Repair Manual, to figure time charges for each type of repair. The times listed in the Motor manual are greater than in Ford's manual.[7]
Marler asserts it charges its non-warranty customers labor-time based on the Motor manual and, therefore, Ford should reimburse Marler for warranty work based on the Motor manual's time standards.[8]
*661 Ford, however, asserts that commercial flat-rate manuals, such as the Motor manual, "are not based on actual time studies and may be no more than an arbitrary mark up to the Ford Labor Time Standards." Ford states that if a dealer actually uses more time to perform a warranty repair, Ford dealers have the option of requesting additional reimbursement based on the actual amount of time used in the repair job. The dealer can charge the time as "M time," which is any time used in a dealership repair facility that isn't designated by a specific labor operation code.
Marler contends, however, that Ford will not allow it to use M time to charge additional time to any labor operation that has a defined time.
Craig Green, Ford's former Warranty and Policy Manager, testified that 80% of dealer claims are processed electronically and result in overnight credit to the dealer for warranty claims. The general rule for reimbursing dealers for parts is cost plus 40% for vehicles, a figure used since the 1994 model year. Green said approximately half the states have statutes that allow for supplemental reimbursement to dealers for parts above the 40%.
As for the hourly labor rate for warranty repairs, Green testified Ford offers dealers two options: a retail rate option and a labor rate separation program. In the retail rate option, the dealer proves to Ford what it is charging retail customers and Ford reimburses the dealer at that rate for warranty repairs. The labor rate separation program, in contrast, allows dealers to have a warranty labor rate separate from a retail labor rate, and gives dealers an annual increase in their warranty costs every June based on the cost-of-living index and service costs in dealerships nationally. The labor rate separation program allows dealers to have a lower retail rate if they choose, so they need not increase their retail labor rate in order to get an increase from Ford on the warranty labor rate. Marler Ford is on the retail rate option.
Green said Ford reimburses dealers at the same warranty labor rate, referred to as an A-tech labor rate, regardless of the work being done, whether it's "an engine overhaul by a very experienced, skilled technician or ... the porter taking the plastic off the seats of a new car."
As for the Ford Service Labor Time Standards, Green testified they reflect an actual clocking of the time it takes to perform an individual repair, including additional time for driving in, driving out, finding keys, getting parts, etc. It accumulates all those times "over and above the wrench time" and adds a contingency of 20%. These time standards determine how much a dealer is reimbursed for warranty work.
Green said Ford has a procedure by which service technicians can request review of time standards they feel are inaccurate. Any dealer or dealer technician can request such a review.
Green said that commercial flat-rate manuals, such as Motor or Chilton's, are published primarily for use by independent repair shops. They give time estimates for particular repairs on particular models of particular manufacturers. Green stated that Ford does not use the time standards in those manuals because Ford knows what a fair and reasonable labor time to perform a repair is, since Ford actually performs them to establish its own time standards.
Green read a notation from the 2002 Motor Parts and Labor Guide, Professional Service Trade Edition, which he admitted was included at Ford's insistence:

*662 The recommended times for the repairs described in this publication with respect to Ford and Lincoln-Mercury brand of products are not solely based on time studies conducted by Ford Motor Company. The repair times it recommends to its franchise dealers for warranty repairs are based on time studies for the diagnostic and repair procedures it conducts and publishes in Ford Motor Company service manuals. Accordingly, the recommended repair times specified in this publication are designed for after market repairs only.
Green testified further that Ford has a procedure to allow dealers to claim reimbursement for actual time in situations where repair takes longer than the Ford published time. It is called M time and it is fairly common on warranty claims. Green read from Ford's October 2000 Warranty and Policy Manual, which said:
Actual time labor operation is used only when there is no published labor operation in the Ford Service Assigned Standards Manual or for highly unusual repair situations when additional time is required to complete the repair. A full description of the need for the actual time operation must be listed in the form and the request must be reasonable. Actual time labor operations are to be used as follows: body repair; labor operation not published; the published time operation requires additional time; or abnormal diagnosis time.
According to Green, if the technician followed the defined repair process steps, the job should be done with time to spare within the Ford time standard.
With respect to dealer reimbursement for parts, Green said Ford's procedure reflects the statutory language regarding "like kind" repairs. For a dealer to get supplemental reimbursement for warranty repair, Ford requires the dealer to provide documentation as to what it actually charged a retail customer for a like-kind product. The procedure does not require an exact match between parts, simply a part with the same base part number, a very broad category match. Green said it is Ford's way of attempting to confirm what a like-kind repair actually cost a dealership in a retail environment.
According to Green, Ford could not set up this procedure to work on the normal warranty claims computer system because Ford has approximately 5,000 dealers, each of which can have more than one part-pricing policy across multiple parts and parts they have in their stores. Green said programming a computer system to comprehend all the differences is "beyond [Ford's] capabilities." To document a dealer's hourly retail labor rate requires from 100 to 200 consecutive retail repair operations, depending on the size of the dealership.
Green knew of only two dealers that had submitted claims under the supplemental reimbursement procedure, one in New Jersey and one in Virginia. He said Ford reviewed, documented, and paid the claims, and those dealers continued the claims procedure for a period of time, but eventually stopped.
Green admitted that at the time of the hearing, there was no dealer in the United States being paid under the procedure. Green denied that the effect of the procedure had been to discourage dealers from filing warranty claims for reimbursement for parts at retail.
In reviewing the evidence and applying the statute, we find the Commission's ruling is supported by a preponderance of the evidence. It is neither arbitrary nor capricious nor an abuse of discretion. The statute requires reimbursement at not less than the price or *663 rate charged to retail customers for "nonwarranty work of like kind." Thus, it is reasonable for Ford to insist on verification of the dealer's retail prices and rates. The Illinois/New Jersey averaging procedure advocated by Marler is inappropriate, considering not only the language of the Louisiana statute but also the wide variation in retail prices shown in Marler's exhibits.[9] We agree that the procedure may be burdensome, but Marler has not presented a reasonable alternative that is also fair to Ford. Accordingly, the Commission's ruling on warranty work reimbursement is affirmed.

SURCHARGE
The applicable portion of La.R.S. 32:1254 states:
N. It shall be a violation of this Chapter:
* * *
(6) For a manufacturer of motor vehicles ...:
* * *
(b) To attempt to induce or coerce, or to induce or coerce, any motor vehicle dealer to enter into any agreement with such manufacturer ..., or to do any other act unfair to said dealer; or to threaten to cancel any franchise or any contractual agreement existing between such manufacturer ... and said dealer for any reason including but not limited to failure to meet performance standards;
* * *
(e) To resort to or use any false or misleading advertisement in connection with his business as such manufacturer of motor vehicles, distributor, wholesaler, distributor branch or factory branch, or officer, agent, or other representative thereof....
The language that Marler claims is an impermissible attempt to coerce Marler to desist from these proceedings was contained in a January 19, 2001 letter to Daniel Webb, President of Marler Ford, from Phil Meilak, Reimbursement Policy & Legal Liaison for Ford Motor Company. In the letter Meilak set out Ford's procedure for warranty reimbursement at retail levels. At the end of the letter, in a section titled Ford's Cost Recovery, Meilak stated:
To recover the higher cost of doing business in Louisiana as a result of paying warranty amounts higher than provided for in its National Parts Policy, Ford plans to increase the price of new vehicles sold to all dealers in Louisiana. Ford will notify all authorized Ford and Lincoln Mercury dealers in Louisiana in advance of the amount and timing of any vehicle surcharge.
Later, however, after Marler had filed complaints with the Commission, Ford asserted the surcharge complaint was premature, stating, "Ford has not levied any surcharge in Louisiana and has no intent to do so at the present time." Ford contends its statement, above, was a reservation of the right to levy a surcharge on new vehicles sold to dealers in Louisiana if Ford incurs additional costs for reimbursing dealers in Louisiana for warranty work. Ford says it currently has no plans to levy any surcharge in Louisiana because to date Ford has not incurred any additional costs associated with warranty reimbursement in Louisiana.

*664 Moreover, even if Ford were to incur any additional costs associated with warranty reimbursement in Louisiana, Ford would have to consider, among other things, the additional costs that would be incurred and how such costs would be recouped, if at all, in determining whether Ford would increase the price of new vehicles sold to Louisiana dealers.
Craig Green testified that the "cost recovery" language in Meliak's letter of January 19, 2002 was sent with Green's approval; Meliak worked under Green's supervision at the time. Green said the language was included in the letter so there would be no surprises in the event Ford instituted a cost recovery surcharge. Ford did not intend it as a threat.
Accordingly, Ford asserts that the Commission properly dismissed Marler's complaint about the surcharge, because it would have required the Commission to issue an advisory opinion based on facts not in existence and, therefore, premature.
Considering all the facts, we find the Commission correctly dismissed the surcharge complaint.
For the foregoing reasons, the judgment of the district court upholding the ruling of the Louisiana Motor Vehicle Commission and dismissing the complaint of Marler Ford, Inc. is affirmed. Costs of this appeal are assessed against Marler Ford, Inc.
AFFIRMED.
NOTES
[1] The issues in this case are governed by the laws on distribution and sale of motor vehicles, La.R.S. 32:1251-1261.
[2] Pursuant to La.R.S. 32:1253(I) (as amended by Acts 1997, No. 211, § 1), the Commission's domicile for being sued is Jefferson Parish.
[3] In the states of Maine, New Jersey and Illinois, however, Ford pays dealers' retail parts prices due to court judgments and threatened litigation.
[4] Marler admitted there are exceptions to the general rule in its markup on parts. Marler gives discounts to some fleet customers, government agencies, to some customers on a case-by-case basis, and also discounts highly competitive items.
[5] Of the sample 100 presented as evidence, from which Marler derived its figure for "average mark-up," the lowest mark-up was 52.78% and the highest mark-up was 209.92%.
[6] "In no event shall any manufacturer ... pay its dealers at a price or rate for warranty work that is less than that charged by the dealer to the retail customers of the dealer for nonwarranty work of like kind." (Emphasis added.) La.R.S. 32:1254(N)(6)(o)(ii).
[7] The custom of the industry is to use a flat-rate manual to give estimates to customers prior to the repair. These manuals list a time for every type of repair. The repair shop charges the customer for the flat-rate time, regardless of the actual time used in making the specific repair.
[8] Marler admitted that it occasionally gives discounts on labor costs to non-warranty customers and for highly competitive maintenance services. Thus, Marler admitted, it does not use the Motor manual flat-rate labor time for 100% of its repair jobs.
[9] We note that the applicable statutes in both Illinois and New Jersey employ different language than does Louisiana's. For example, they use the term "predominant retail rate."