COURT OF APPEALS OF VIRGINIA


Present:   Chief Judge Felton, Judges McCullough and Huff
Argued at Alexandria, Virginia


NAVISTAR, INC.
                                                                OPINION BY
v.        Record No. 2343-11-4                    JUDGE STEPHEN R. McCULLOUGH
                                                                AUGUST 14, 2012
NEW BALTIMORE GARAGE, INC. AND
 COMMISSIONER, VIRGINIA DEPARTMENT
 OF MOTOR VEHICLES


              FROM THE CIRCUIT COURT OF FAUQUIER COUNTY
                         Jeffrey S. Parker, Judge

          Jonathan P. Heyl (Scott D. Helsel; Smith Moore Leatherwood LLP;
          Walton & Adams, P.C., on briefs), for appellant.

          Clifford L. Athey, Jr. (C. Todd Gilbert; Kimberly M. Athey; Pond,
          Athey, Athey & Pond, P.C., on brief), for appellee New Baltimore
          Garage, Inc.

          Eric K.G. Fiske, Senior Assistant Attorney General (Kenneth T.
          Cuccinelli, II, Attorney General; Janet L. Westbrook, Assistant
          Attorney General, on brief), for appellee Commissioner, Department
          of Motor Vehicles.


        The Commissioner of the Department of Motor Vehicles concluded that a chargeback in the

amount of $57,333.60 and a reduction in the hourly labor rate that Navistar, Inc. imposed on New

Baltimore Garage, Inc. for warranty work were invalid under Code § 46.2-1571.  The Circuit Court

for Fauquier County affirmed the Commissioner's decision.  Navistar appeals, challenging the

Commissioner's interpretation of the statute, as well as the evidence New Baltimore relied upon to

establish a violation of Code § 46.2-1571.  We conclude that the Commissioner erred in his

interpretation of Code § 46.2-1571.  Therefore, we reverse and remand for a new hearing.

BACKGROUND

## I. NAVISTAR IMPOSES A CHARGEBACK AND A LABOR RATE REDUCTION FOLLOWING CALLS FROM A SECRET SHOPPER.

Navistar manufactures trucks under the "International" brand. New Baltimore sells and services trucks for Navistar pursuant to a franchise agreement. The franchise agreement spells out what New Baltimore can charge Navistar when it performs warranty work for Navistar. Section 3.0.4 of the franchise agreement specifies that, for warranty work, Navistar will pay New Baltimore "[a]n amount equal to the servicing location's approved warranty labor reimbursement rate (not to exceed the posted door rate; reference. Section 8.1.2.1) multiplied by the amount of time allowable for the particular service operation." Under Section 8.1.2.1 of the Warranty Procedures and Administrative Policies Manual, a dealer's "approved warranty labor rate shall not exceed the posted daytime hourly rate which the Dealer charges its customers." At the time the dispute arose, the hourly rate for warranty work approved by Navistar was $102 per hour. By statute, and under the agreement, New Baltimore can request an increase in the hourly labor rate from Navistar.

New Baltimore also performs warranty work for Nissan and performs diagnostic and repair services for non-warranty retail customers. For its non-warranty customers, New Baltimore provides an estimate, but can and does charge an hourly rate based on how long the job takes. However, because customers believe that a written estimate is what will be charged, at times it is necessary to adjust a price downward, even though New Baltimore's mechanics took longer to complete the job than what was anticipated in the estimate.

Warranty work for Navistar operates differently. Navistar approves an hourly rate for its franchisees, and then that rate is multiplied by a "Standard Repair Time," also called an SRT. Standard Repair Times are set forth in a published guide. If a dealer takes more time to make a repair than is provided for in the standard repair time, the dealer is still paid based on the Standard Repair Time. Thus, unlike retail customers, for which there is no hourly cap, the Standard Repair

Time caps the hours New Baltimore can charge Navistar for warranty repairs. To illustrate, if it takes New Baltimore five hours to perform a specific repair, New Baltimore can charge the retail customer for the full five hours. If the same warranty repair for Navistar is capped by a standard repair time of three hours, New Baltimore can charge Navistar only for three hours, even if it took five hours to complete the job.

In the event a repair is not covered by a Standard Repair Time, New Baltimore can charge "an amount equal to the approved warranty labor reimbursement rate multiplied by the actual time reasonably spent performing the warranty service, which is subject to audit by [Navistar]." These charges are known as "T time." T-time charges can also apply when a particular repair proves exceptionally difficult. T-time operates in a way that is similar to the rates charged to retail customers. Navistar carefully monitors those charges and can approve or deny them.

Not all work performed by New Baltimore for Navistar fits into the two basic categories above. Navistar has developed additional pricing plans for its dealers, such as the Performance PM program, which allows participating dealers to charge a flat dollar amount for a particular service. Another such program is the Service Partners program, designed for large fleet customers. Both of these programs are voluntary; dealers are not required to participate in them. Finally, there are "policy adjustments." Policy adjustments, or "policy," are repairs done out of warranty, but ones that Navistar covers for the sake of good customer relations. Occasionally, the dealer covers part of a policy repair.

The evidence established that New Baltimore also charges certain fees to non-warranty customers. For example, New Baltimore charges a flat fee for computer use to retail customers. The fee is imposed to offset the cost of the computer. Navistar does not pay this fee for its warranty work.

On May 12, 2008, after New Baltimore sought an hourly rate increase from Navistar, a Navistar employee made a "secret shopper" call to New Baltimore. A New Baltimore employee quoted the secret shopper a labor rate of $90 per hour. The $90 rate quoted to the secret shopper was below the $102 posted "door rate" Navistar had approved for New Baltimore. Based on this discrepancy, Navistar concluded that New Baltimore was charging Navistar $102 for warranty work while charging its retail customers $90 per hour. This practice, Navistar concluded, placed New Baltimore in violation of its franchise agreement. On June 16, 2008, Navistar imposed a "chargeback" on New Baltimore for the twelve preceding months.[1] Navistar calculated the chargeback by multiplying the total number of warranty hours that New Baltimore had billed Navistar between May 19, 2007 and May 20, 2008, which was 4,778.8 hours, by $90 per hour. The difference between the quoted $90 and the approved $102 hourly rates for this warranty work is $57,333.60. Navistar considered this amount to be its "overpayment" to New Baltimore under the franchise agreement.

In July of 2008, a Navistar secret shopper made another call, and New Baltimore again quoted a rate of $90 per hour. On July 15, 2008, Navistar unilaterally reduced the hourly rate it pays to New Baltimore for warranty work to $90 per hour. Effective October 21, 2008, Navistar approved a rate increase from $90 to $107 per hour.

II. NEW BALTIMORE SEEKS ADMINISTRATIVE REVIEW OF THE CHARGEBACK.

New Baltimore challenged the chargeback and the rate reduction by requesting a formal hearing before the Commissioner of the Department of Motor Vehicles. See Code § 46.2-1571(F).

---

[1] We note parenthetically that in 2010, the General Assembly reduced the period for allowable chargebacks to six months from the previously allowable twelve months. Intentionally false or fraudulent claims submitted by dealers remain exempt from this limitation. 2010 Va. Acts ch. 284 (amending Code § 46.2-1571(A)(6)). That change, which occurred after the chargeback imposed by Navistar in this case, has no impact on the present litigation.

New Baltimore asked the Commissioner to declare both the chargeback and the rate change unlawful under Code § 46.2-1571.

At the hearing, New Baltimore offered testimony from Bill Jordan, a Certified Public Accountant. Jordan performed a comparison of the bills New Baltimore submitted to retail customers and bills submitted to Navistar for warranty work for a single month: from April 1, 2008 through May 1, 2008. New Baltimore performed 234 transactions during this period, 132 for non-warranty work and 78 for warranty work. George Downes, Jr., the Vice-President and General Manager for New Baltimore, testified that this was an average month for non-warranty repairs. Jordan excluded from these figures transactions that were neither warranty nor non-warranty. Most of those transactions were coded as "I" for "internal." After examining the total hours billed under the warranty and non-warranty rates, Jordan testified that the billed warranty labor rates averaged $74.27 per hour, whereas the billed non-warranty rates averaged $81.08 per hour.

Jordan explained that to determine which repairs were warranty repairs, he relied on the "C" and "W" code listed on Navistar's billing records. "C" indicates non-warranty work and "W" generally stands for warranty service. Jordan did not know which "W" repairs were performed for Nissan and which were done for Navistar. Downes, however, stated that he examined the documentation submitted to Jordan for that month and could not find any that were labeled "Nissan UD," indicating that there were no Nissan warranty repairs for the month in question. The "W" code also could signal that the repair was a policy repair. Jordan also was not aware of promotional programs or other discount programs utilized during that period.

Aside from the testimony of the secret shopper, Navistar presented no evidence or testimony with regard to the chargeback or the reduction in the hourly rate.

The hearing officer's decision focused on the franchise agreement. The franchise agreement forbids the dealer from billing Navistar at a higher rate than the "posted rate" for retail customers.

The posted rate for New Baltimore was $102, the same as the rate at which New Baltimore billed Navistar for warranty work. The hearing officer concluded, based on this contractual language, that the twelve-month chargeback was invalid. The hearing officer also concluded that the reduction in the warranty rate to $90 per hour was not permitted under the statute. The Commissioner reviewed the record and upheld the decision of the hearing officer. Navistar filed a petition for appeal of this decision to the Circuit Court for Fauquier County.

The circuit court reversed the Commissioner's decision, concluding that

> the ultimate legal issue in this case is the *actual* rate of compensation, which takes into account the calculation of hourly rate times hours *expended* on the job. Neither the Commissioner nor the Hearing Officer ever made an explicit factual finding on this issue. Without that finding, no legitimate comparison between the two rates can be made, nor can a legal conclusion on the ultimate issue in this case be reached.

The court reversed and remanded for reconsideration.

On remand, the hearing officer accepted the testimony offered by New Baltimore that

> [t]he average labor rate per warranty customer based on the hourly rate times the hours expended on the job was $74.24 per hour, whereas the average labor rate for non-warranty customer work was $81.08 per hour. Therefore, the compensation by Navistar of New Baltimore Garage in this case was less than the amount charged by the dealer to the retail customers, in violation of Code § 46.2-1571.A.1.

The hearing officer again ruled that the chargeback and the reduction in the hourly rate for warranty work from $102 to $90 were invalid. The Commissioner upheld the decision of the hearing officer, as did the circuit court. Navistar then appealed to this Court.

ANALYSIS

> Although decisions by administrative agencies regarding matters within their specialized competence are "entitled to special weight in the courts," Johnston-Willis, Ltd. v. Kenley, 6 Va. App. 231, 244, 369 S.E.2d 1, 8 (1998), "when, as here, the question involves an issue of statutory interpretation, 'little deference is required to be accorded the agency decision' because the issue falls

- 6 -

outside the agency's specialized competence." Sims Wholesale Co. v. Brown-Forman Corp., 251 Va. 398, 404, 468 S.E.2d 905, 908 (1996) (quoting Johnston-Willis, Ltd., 6 Va. App. at 246, 369 S.E.2d at 9). "In sum, pure statutory interpretation is the prerogative of the judiciary." Id.

Va. Imps., Ltd. v. Kirin Brewery of Am., LLC, 41 Va. App. 806, 821, 589 S.E.2d 470, 477 (2003). Therefore, we review questions of statutory construction *de novo*. Specialty Bev. Co. v. Va. Alcoholic Bev. Contr. Bd., 51 Va. App. 154, 161, 655 S.E.2d 740, 743 (2008). With respect to the agency's factfinding, however, "we defer to the agency just as we would a jury or a trial court." Citland, Ltd. v. Commonwealth, 45 Va. App. 268, 274, 610 S.E.2d 321, 324 (2005).

"Under basic rules of statutory construction, we determine the General Assembly's intent from the words contained in the statute. When the language of a statute is plain and unambiguous, courts are bound by the plain meaning of that language." Volkswagen of Am., Inc. v. Smit, 266 Va. 444, 452, 587 S.E.2d 526, 531 (2003).

Franchise agreements must conform to the Code. See Code § 46.2-1569(9). Code § 46.2-1571(A)(1) provides that "[c]ompensation of a dealer for warranty . . . service . . . shall not be less than the amounts charged by the dealer . . . to retail customers for nonwarranty service." Code § 46.2-1571(B)(5) further provides that it is unlawful for any motor vehicle manufacturer

> to . . . [f]ail to fully compensate its motor vehicle dealers licensed in the Commonwealth for warranty parts, work, and service pursuant to subsection A either by reduction in the amount due to the dealer or by separate charge, surcharge, or other imposition by which the motor vehicle manufacturer . . . seeks to recover its costs of complying with subsection A.

These statutes are component parts of a statutory scheme designed to "prevent unfair methods of competition and unfair or deceptive acts or practices." Code § 46.2-1501.

## I. CODE § 46.2-1571 REQUIRES A COMPARISON OF AMOUNTS, NOT RATES, MINUS STATUTORILY SPECIFIED DEDUCTIONS.

A. Navistar's exclusive focus on labor rates is not supported by the plain text of the statute.

We first examine Navistar's proposed construction of Code § 46.2-1571. For Navistar, the hourly labor rate, rather than the compensation amount, constitutes the linchpin to determine compliance with Code § 46.2-1571(A)(1). Navistar contends that "the proper application of th[e statute's] language requires a comparison of two rates: (1) the standard hourly warranty rate that a manufacturer and dealer have agreed on, prior to adjustments, and (2) the standard hourly nonwarranty rate that a dealer quotes and charges as its base rate to its retail customers, again prior to adjustments." Appellant Br. at 23.

The difficulty with Navistar's exclusive focus on an hourly labor rate is that the statute does not mention approved hourly labor rates or quoted hourly labor rates. Instead, it speaks of *amounts*. See Code § 46.2-1571(A)(1) ("Compensation of a dealer for warranty . . . service . . . shall not be less than the *amounts* charged by the dealer . . . to retail customers for nonwarranty service." (emphasis added)). Indeed, in 1992, the General Assembly specifically amended this clause by deleting the word "rates" and substituting the word "amounts." 1992 Va. Acts ch. 135. "As a general rule, there is a presumption that a substantive change in law was intended by an amendment to an existing statute." Dale v. City of Newport News, 243 Va. 48, 51, 412 S.E.2d 701, 702 (1992). "Amount" is a broader term than an hourly labor rate. The amount is the "total number or quantity." Webster's Third New International Dictionary 72 (1981). An hourly labor rate, on this evidence, is a subset of the total "amount." Other components of the "amount" include certain charges, like waste disposal charges or computer use fees charged to non-warranty customers. Such fees or charges are not captured by an exclusive examination of the hourly rate. In addition, when a manufacturer has capped the hourly rate based on predetermined Standard Repair Times, comparing hourly labor rates charged for warranty work with hourly labor rates that a dealer

- 8 -

charges for non-warranty work may prove misleading. It is certainly possible that the capped hourly rate could result in a significant shortfall compared to the uncapped hourly rate. New Baltimore might bill a retail customer at an hourly rate of $90 per hour and still receive the same amount or less than the amount it receives from Navistar for a rate of $102 per hour due to the cap Navistar imposes. Therefore, we reject Navistar's proposed construction of the statute.

B. The statute requires a series of concrete steps to compare warranty compensation with non-warranty compensation in order to ensure that compensation for warranty work is "not less than" compensation paid by retail customers.

We hold that a dealer who seeks relief under Code § 46.2-1571 for a chargeback imposed by the manufacturer, or a unilateral reduction in the hourly rate of compensation imposed by a manufacturer, bears the burden of proving that the chargeback would result in compensation that is "less than the amounts charged by the dealer for . . . service to retail customers."[2] In order to make the comparison of warranty compensation with amounts charged to retail customers for non-warranty service, Code § 46.2-1571 contemplates specific steps. First, the dealer must gather data for the applicable time frame. If a chargeback is at issue, the relevant time frame is the period of the chargeback – in this instance, twelve months. With regard to a unilateral reduction in the hourly labor rate by the manufacturer, the applicable time frame is the period for which the rate was reduced, here July 15 to October 21, 2008. Second, in order to determine the amount of compensation, the dealer should calculate the total billing for the warranty work performed for the manufacturer who imposed the chargeback[3] and separately calculate the total billing for non-warranty work for the relevant period. The hours billed for labor are one component of this total amount. Fees or surcharges, if any, that are passed on to the manufacturer or to the retail client

---

[2] In formal hearings under the Administrative Procedure Act, "[t]he burden of proof shall be upon the proponent or applicant." Code § 2.2-4020(C); see also Code § 2.2-4027.

[3] New Baltimore also performs warranty work for Nissan. Those charges are irrelevant in assessing whether the chargeback imposed by Navistar offends the statute.

also should be included. As noted above, such fees are subsumed under the term "amounts." Third, certain charges should be excluded from this total amount. The statute specifies that "group discounts, special event discounts, and special event promotions shall not be considered in determining amounts charged by the dealer to retail customers." Code § 46.2-1571(A)(2). Likewise, "[f]or purposes of determining labor compensation for warranty body shop repairs paid to a dealer by the manufacturer or distributor, internal and insurance-paid repairs shall not be considered in determining amounts charged by the dealer to retail customers." Id. Fourth and finally, to establish compensation amounts, the warranty and non-warranty amounts thus derived should be divided by the number of labor hours expended during the applicable time frame. The evidence establishes that warranty work and non-warranty work are billed in different ways, with warranty work subject to a cap that does not apply to non-warranty work. This final step will allow the Commissioner to make a meaningful comparison of the hourly compensation amounts of warranty and non-warranty work.

To the extent the manufacturer-imposed chargeback or the lower hourly labor rate imposed by the manufacturer results in an amount of compensation for warranty work that is "less than" the amount of compensation for non-warranty work, the statute precludes such a chargeback or lower hourly labor rate.[4]

## II. THE RULING OF THE COMMISSIONER, ADOPTED BY THE CIRCUIT COURT, OMITS SOME OF THE KEY STEPS REQUIRED BY CODE § 46.2-1571.

The Commissioner's interpretation and application of the statute omits a number of key steps noted above. First, as Navistar notes, although the chargeback was for twelve months, New Baltimore's expert offered evidence concerning billings for one month only. The Commissioner responds by noting Downes testified on behalf of New Baltimore that the month of April 2008 was

___

[4] Code § 46.2-1571 also regulates compensation for parts. There is no dispute about compensation for parts. Therefore, we do not address that component of the statute.

a "typical" month and, therefore, these typical results could be extrapolated to the remaining eleven months. The actual testimony is as follows:

> Q. How many non-warranty repairs do you do in a year, approximately?
> A. I can't answer that.
> Q. Well, you've got 134 non-warranty repairs that Mr. Jordan analyzed covering a month. Do you think that's about an average month?
> A. I would say that was an average month, yes.
> Q. So if you multiplied that by 12, you'd have approximately the number?
> A. If you're looking for an approximation, I would say yes.

Downes' testimony was that the 134 warranty repairs represented an "average month." As Navistar points out, this testimony did not specify that the period at issue was an average period for warranty service. The context of Downes' testimony means that the extrapolation that New Baltimore presses from one month to twelve is not supported by Jordan's testimony. In addition, Downes was clear that multiplying the number of transactions in April numbers by 12 was an "approximation." An approximation based on only non-warranty repairs is not sufficient to show that the compensation Navistar paid to New Baltimore for warranty work is deficient under the statute.

Second, Navistar points out that Jordan did not eliminate from his calculations warranty work New Baltimore may have performed for Nissan. Jordan acknowledged that he did not eliminate any warranty work performed for Nissan from his total calculation of warranty work. Instead, he relied on the presence of the Code "W" indicating warranty work. Although Downes testified that he could not find any Nissan work in the documentation submitted to Jordan, the hearing officer, in her factual findings – findings that are binding on this Court – concluded that "[s]ome of the 'W' or warranty repairs on the printouts might have been for other makes." The Commissioner agreed with this factual finding. This finding casts further doubt on the accuracy of the conclusions New Baltimore's expert drew from his data because warranty repairs for Nissan may have been incorrectly included in Jordan's calculations.

Third, Navistar notes that some non-warranty policy repairs may have been incorrectly included in Jordan's assessment of warranty repairs. The hearing officer noted in her factual findings that "sometimes a 'W' could mean a 'policy' repair, for which Navistar pays part and New Baltimore pays part." Moreover, New Baltimore's own evidence established that policy repairs were not warranty repairs. Downes testified that "policy" was an "[o]ut of warranty adjustment, good will." The statute is concerned with a discrepancy between warranty payments by a manufacturer and non-warranty payments by retail customers. Policy repairs constitute neither repairs done for retail customers nor, according to the testimony, do they constitute warranty repairs. The possible inclusion of policy repairs in Jordan's calculation was error.

Fourth, Jordan's testimony does not establish whether he factored in promotional or discount programs for New Baltimore's retail customers. With respect to "menu-priced . . . services, group discounts, special event discounts, and special event promotions," Code § 46.2-1571(A)(2) specifies that these items "shall not be considered in determining amounts charged by the dealer to retail customers" when "determining warranty . . . and service compensation paid to a dealer by the manufacturer." The record does not establish whether there were any such menu priced services, group discounts, special event discounts, and special event promotions, but, if there were, Jordan did not exclude them as required by Code § 46.2-1571(A)(2).

With respect to voluntary service programs, such as the Performance PM or Service Partners, the record does not establish if they are warranty programs or non-warranty programs. Although these programs are developed by Navistar, the evidence adduced indicates that the flat rate prices are paid by the customers, not Navistar. The purpose of the programs is to create a nationwide uniform pricing system for customers with Navistar vehicles. The evidence suggests, but does not clearly establish, that these programs are not warranty programs. If the Performance PM or Service Partners programs are retail programs, billing under those programs should be

included as a part of the amount of compensation New Baltimore receives from retail customers *unless* they fall within the exclusion of "menu-priced . . . services, group discounts, special event discounts, and special event promotions" under Code § 46.2-1571(A)(2). If these programs are warranty programs, they should be included under that category as part of the amount of compensation New Baltimore receives for warranty work.

In sum, the testimony offered by New Baltimore was limited to one month rather than the full twelve months of the chargeback or the time period of the rate reduction. Based on the facts, as found by the Commissioner, it is not clear whether warranty work performed for another manufacturer, Nissan, was included in the calculation. It does not appear that New Baltimore's expert factored into the compensation amounts any fees that New Baltimore charges to retail customers, despite evidence in the record that it assesses such fees. Finally, the calculation below does not address group discounts or special event promotions, if any.

Where the Commissioner's legal conclusion rests upon a flawed interpretation of the statute, a remand for factfinding under the correct interpretation is the appropriate remedy. See Smit, 266 Va. at 453, 587 S.E.2d at 532 (remanding the case for further factfinding in light of the flawed interpretation of the statute accepted by the lower courts and the Commissioner).

III. CODE § 46.2-1571 DOES NOT SUFFER FROM UNCONSTITUTIONAL VAGUENESS.

Navistar argues that averaging the non-warranty and warranty amounts, after appropriate deductions, renders the statute unconstitutionally vague. Navistar notes that an effective labor rate might fluctuate over time, depending on the type and complexity of repairs performed under both the warranty and non-warranty category. For example, in a given month the dealer may have many complex non-warranty repairs, but only a few simple and inexpensive warranty repairs. Consequently, Navistar argues, a manufacturer would have no way of knowing, at any given point

- 13 -

in time, whether the manufacturer is in compliance with the statute. Navistar's argument rests on a misreading of the statute.

Code § 46.2-1571 does not require manufacturers constantly to monitor the compensation paid to dealers for warranty versus non-warranty work on an hourly, weekly, or monthly basis. First, the plain language does not require the sort of constant monitoring of warranty versus non-warranty compensation that concerns Navistar. Second, the statute contemplates discrete triggering events that, when challenged, require a comparison of the amounts of compensation paid for warranty versus non-warranty work for discrete periods of time. These triggering events include a manufacturer imposed "reduction in the amount due to the dealer or by separate charge, surcharge, or other imposition" pursuant to Code § 46.2-1571(B)(5), applications for increases in service compensation under Code § 46.2-1571(A)(3), and chargebacks as set forth in Code § 46.2-1571(A)(6).

As noted above, if a manufacturer imposes a chargeback, the applicable time frame for purposes of the analysis under Code § 46.2-1571 is the period of the chargeback. Code § 46.2-1571(A)(6). With regard to increases in the labor rate, the statute specifies that the applicable period is "100 consecutive repair orders or all repair orders over a ninety-day period." Code § 46.2-1571(A)(3). For a unilateral decrease in the labor rate imposed by a manufacturer, the applicable time frame is, in this instance, July 15, 2008 to October 21, 2008. That is the period of time for which Navistar unilaterally lowered the hourly rate for New Baltimore. See Code § 46.2-1571(B)(5) (prohibiting a reduction in the amount due to the dealer that "[f]ail[s] to fully compensate" the dealer). Therefore, a manufacturer is not required to monitor compensation amounts for warranty and non-warranty work on a daily or hourly basis. Instead, the comparison contemplated by Code § 46.2-1571 comes into play when a manufacturer takes a specific step, such as imposing a chargeback, unilaterally lowering the hourly rate for warranty work, or refusing a rate

increase requested by the dealer. Although the plain language and structure of the statute dispose of Navistar's vagueness argument, our reading of the statute also is consistent with the well-established view that, "whenever possible, we will interpret statutory language in a manner that avoids a constitutional question." Commonwealth v. Doe, 278 Va. 223, 229, 682 S.E.2d 906, 908 (2009). Therefore, when a manufacturer decides to impose a chargeback, refuse a rate increase, or unilaterally decrease the labor rate, it has "fair notice" of what the statute requires and whether such an action will be in compliance with the statute. Volkswagen of Am., Inc. v. Smit, 279 Va. 327, 337-38, 689 S.E.2d 679, 684-85 (2010). To the extent Navistar is uncertain whether a unilateral labor rate reduction or a chargeback would lead to a violation of the statute, it can request applicable documentation from the dealer to ensure that the rate reduction or the chargeback does not offend the requirements of Code § 46.2-1571.[5]

## CONCLUSION

We reverse and remand to the Circuit Court of Fauquier County, with instructions to remand to the Commissioner for further proceedings consistent with this opinion.

Reversed and remanded.

---

[5] Based on our resolution of this appeal, we do not consider Navistar's remaining arguments and assignments of error.