**JIM WHITE AGENCY COMPANY,
d/b/a Jim White Nissan,
Plaintiff–Appellant,**

**v.**

**NISSAN MOTOR CORPORATION IN
U.S.A., Defendant–Appellee.**

No. 96–3859.

United States Court of Appeals,
Sixth Circuit.

Argued April 25, 1997.

Decided Sept. 29, 1997.

William M. Connelly (argued and briefed), Sarah Steele Riordan, Anthony P. Georgetti (briefed), Connelly, Soutar & Jackson, Toledo, OH, for Plaintiff–Appellant.

Mark S. Mester (briefed), Kevin A. Russell (argued and briefed), Kenneth G. Schuler (briefed), Latham & Watkins, Chicago, IL, Keith L. Mitchell, Toledo, OH, Charles Ryan, Gardenia, CA, for Defendant–Appellee.

Jay F. McKirahan (briefed), Dublin, OH, for Amicus Curiae.

Before: MARTIN, Chief Judge, RYAN and GIBSON,* Circuit Judges.

RYAN, Circuit Judge.

### OPINION

The plaintiff, Jim White Agency Company (JWA), appeals from the district court's

---

* The Honorable Floyd R. Gibson, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

grant of summary judgment for the defendant, Nissan Motor Corporation in U.S.A., in a case alleging violation of a franchise agreement under the Ohio Dealers Act, Ohio Rev. Code Ann. §§ 4517.01–4517.99 (Anderson 1997). JWA contends the lower court erred in determining, as a matter of law, that Nissan did not violate the good-faith requirement of the Act. JWA also claims the court erred in finding that Nissan had properly reimbursed it for warranty repair parts. For the reasons that follow, we will affirm.

## I.

Plaintiff Jim White Agency, d/b/a Jim White Nissan, was a licensed automobile dealership in Toledo, Ohio. JWA was in the business of selling and servicing Nissan motor vehicles under a franchise agreement with defendant Nissan Motor Corporation in U.S.A. That agreement provided, in pertinent part:

> Dealer shall not move, relocate, or change the usage of the Dealership Location or any of the Dealership Facilities, or substantially modify any of the Dealership Facilities, nor shall Dealer or any person named in the Final Article of this Agreement directly or indirectly establish or operate any other locations or facilities for the sale or servicing of Nissan Products or for the conduct of any other of the Dealership Operations contemplated by this Agreement, without the prior written consent of Seller.

The JWA dealership was on "automobile row," an area in Toledo in which 17 other dealerships are located. In 1992, JWA sought, and was granted, approval to relocate the Nissan dealership next to a Toyota dealership; a move of approximately 50 yards.

Beginning in the early 1990's, JWA began to experience significant sales decreases and, in 1992, sought a buyer for the dealership. After receiving several offers, JWA entered into a verbal agreement with Jim Yark. Nissan had tentatively approved the sale to Yark when JWA announced that instead of selling the dealership, it would combine or "dual" the Nissan dealership with a Chevrolet dealership it owned that was located several miles from "automobile row." To that end,

in 1994, JWA requested permission to move the Nissan dealership to the Chevrolet location.

Michael Clubb was a Dealer Operations Manager for Nissan for the region where JWA was located. Clubb was the primary intermediary between Nissan and JWA. After learning of JWA's desire to "dual" the Nissan and Chevrolet dealerships, Clubb sent JWA a letter indicating Nissan's opposition to JWA's relocation. Several reasons were given: 1) Marketing reports indicated that "automobile row" was the best location for selling Nissan cars; 2) JWA's financial problems were the result of poor management practices rather than location; and 3) the "planning volume," which is a number indicating the sales potential for any given market, indicated that a non-dualed dealership was in Nissan's best interest.

JWA accused Nissan of bad faith in refusing to allow it to move the dealership, and threatened legal action. Subsequently JWA sent a letter to Roger Jolicoeur, Clubb's superior, requesting approval of the deal. JWA's request was discussed at Nissan regional headquarters and a decision was made to deny relocation. Thereafter, in late 1995 or early 1996, JWA sold the Nissan dealership to an outfit named Autofair.

At the time JWA operated as a Nissan dealership, it performed warranty service on Nissan cars pursuant to the dealership contract. The contract provided that all warranty work was to be completed according to the terms and conditions contained in the warranty manual. The warranty manual set the rate at which Nissan would compensate JWA for *labor costs* at the dealer's retail/customer labor rate, and provided that reimbursement for *parts* would be at the dealer net cost plus a 30% markup. Because JWA charged a different markup on parts for retail customers, it contends that the parts reimbursement clause violated Ohio Rev.Code Ann. § 4517.52 (Anderson 1997).

JWA filed suit in Ohio state court alleging violation of the Act. Nissan then removed the action to the United States District Court for the Northern District of Ohio. During discovery, the district court denied JWA's motion

for partial summary judgment on the warranty reimbursement claim. After discovery, the district court granted Nissan's motion for summary judgment on all claims. JWA filed this timely appeal.

## II.

■ We first address whether the district court properly granted summary judgment, holding that Nissan had not violated the good-faith requirement of Ohio Rev.Code Ann. § 4517.59. The Ohio Dealers Act states, in relevant part:

Notwithstanding the terms, provisions, or conditions of any agreement, franchise, or waiver, no franchisor shall: (A) In acting or purporting to act under the terms, provisions, or conditions of a franchise or in terminating, canceling, or failing to renew a franchise, fail to act in good faith.

Ohio Rev.Code Ann. § 4517.59(A) (Anderson 1997). The Act defines good faith:

"Good Faith" means honesty in the conduct or transaction concerned and the observance of reasonable commercial standards of fair dealing in the trade as is defined in division (S) of section 1301.01 of the Revised Code, including, but not limited to, the duty to act in a fair and equitable manner so as to guarantee freedom from coercion, intimidation, or threats of coercion or intimidation; provided however, that recommendation, endorsement, exposition, persuasion, urging, or argument shall not be considered to constitute a lack of good faith.

Ohio Rev.Code Ann. § 4517.01(BB) (Anderson 1997).

Section 1301.01(S), referred to in the statute, provides the definition for good faith under the Ohio Uniform Commercial Code and states, " 'Good faith' means honesty in fact in the conduct or transaction concerned." Ohio Rev.Code Ann. § 1301.01(S) (Anderson Supp.1996). Notably, the good-faith definition in section 1301.01 is identical to the good-faith definition found in section 1–201(19) of the Uniform Commercial Code.

The Ohio Supreme Court, in determining good faith under the Uniform Fiduciary Act, indicated the definition it would attach to good faith under section 1301.01(S):

Good faith is defined in R.C. 1339.03(E) as an act when it is in fact done honestly. This is virtually identical to the UCC 1–201(19) definition of good faith: Honest[y] in fact in the conduct or transaction concerned. In determining whether the bank acted with bad faith, courts have asked whether it was commercially unjustifiable for the payee to disregard and refuse to learn facts readily available.

*Master Chem. Corp. v. Inkrott,* 55 Ohio St.3d 23, 563 N.E.2d 26, 31 (1990) (internal quotation marks and citations omitted). Thus, in determining whether Nissan acted in bad faith, the trier of fact would have to determine whether Nissan's actions were "commercially unjustifiable."

Here, the district court reframed the issue before the court and asked, "Whether a franchisor can be found liable for failure to act in good faith where it has done no more than to insist on enforcing its contract rights to the detriment of its franchisee." The court found that: 1) Nissan was not contractually obligated to approve JWA's relocation request; and 2) the Ohio Supreme Court had previously determined that parties to a contract were entitled to enforce them "to the letter" without being guilty of bad faith. *See Ed Schory & Sons, Inc. v. Society Nat'l Bank,* 75 Ohio St.3d 433, 662 N.E.2d 1074, 1082 (1996).

We review a judgment entered as a matter of law *de novo,* using the same standard as the district court. *Holiday Inns, Inc. v. 800 Reservation, Inc.,* 86 F.3d 619, 622 (6th Cir. 1996). Thus, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Further we construe the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *White v. Turfway Park Racing Ass'n,* 909 F.2d 941, 943–44 (6th Cir.1990).

Subject matter jurisdiction in this case arises out of diversity of citizenship. 28

U.S.C. § 1332. Under the *Erie* doctrine, a federal court in a diversity case applies the law of the state in which it sits. *Davis v. Sears, Roebuck and Co.*, 873 F.2d 888, 892 (6th Cir.1989); *see Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). Thus, we apply the law of Ohio in this case, as that is the state in which the court below sits. Additionally, we review *de novo* the district court's determination and interpretation of Ohio's substantive law. Where the relevant state law is unsettled, we rule based on our best judgment as to how the Ohio Supreme Court would rule if faced with the same case. *Salve Regina College v. Russell*, 499 U.S. 225, 231, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991).

Although there are no Ohio cases addressing this issue, we have previously considered the Ohio Dealers Act in a slightly different context. In *Bill Call Ford, Inc. v. Ford Motor Co.*, 48 F.3d 201 (6th Cir.1995), we examined whether a franchisor's failure to approve a prospective purchaser of a dealership as a successor franchisee was a violation of the duty of good faith contained in section 4517.59(A). There, we held that the underlying dealer agreement contemplated that the Ford Motor Co. would negotiate an agreement with any successor franchisee, and on the facts in that case, any delay occasioned by such negotiations was commercially justifiable and not in bad faith. *Id.* at 206–07. Specifically, we stated that "[u]nder Ohio law, [plaintiff] cannot complain that [defendant] violated the duty of good faith simply because [defendant] exercised its clearly expressed contractual rights." *Id.* at 207.

JWA claims *Bill Call Ford* can be distinguished on two grounds. First, the agreement in that case "indisputably gave Ford the right to enter into and negotiate the terms of its own contract with successor franchisees" while the contract in this case did not "explicitly give [Nissan] the right to turn down a relocation request without reasonable consideration." Second, unlike the plaintiff in *Bill Call Ford*, JWA has offered evidence to support the lack of good faith in Nissan's actions. Specifically, JWA points to Nissan's internal guidelines and Nissan's failure to adhere to those guidelines.

Critically, JWA argues that the standard by which we should determine good faith under the statute is one of "commercial reasonableness." However, as we have noted above, we think the proper standard is whether Nissan's actions were commercially justifiable. Additionally, the larger question is not, as Nissan argues, whether it had a right to the "result," *i.e.*, a right to refuse JWA's relocation, but instead, whether Nissan's actions in reaching that result were taken in good faith.

JWA introduced Nissan's internal guidelines, purportedly used to evaluate relocation requests, and argued that Nissan failed to adhere to those guidelines in rejecting JWA's request, and therefore acted in bad faith. However, JWA did not proffer any evidence showing that Nissan was bound, contractually or otherwise, to use those guidelines when evaluating relocation requests. Further, JWA does not dispute Nissan's claim that it evaluated JWA's relocation request in light of demographic studies, on-site inspections, past Nissan sales experience in markets of comparable size, and JWA's overall business performance in running the Nissan dealership.

We are unable to say, given the absence of any contrary probative evidence, that Nissan's actions, in "exercis[ing] its clearly expressed contractual rights," were commercially unjustified and violated its duty of good faith, either in its decision to reject JWA's relocation request or in the manner in which the decision was reached. The district court did not err in granting summary judgment for Nissan on this issue.

### III.

JWA next claims that the district court erred in finding that Nissan had properly reimbursed JWA for warranty repair parts pursuant to section 4517.52. That section provides:

Each franchisor shall compensate each of its franchisees for labor and parts used to fulfill warranty and recall obligations of repair and servicing at rates not less than the rates charged by the franchisee to its

retail customers for like service and parts for nonwarranty work.

Ohio Rev.Code Ann. § 4517.52 (Anderson 1997).

On its face the statute imposes an affirmative duty on Nissan to pay retail rates for parts used in warranty service. Had JWA made a claim at retail rates, and had Nissan subsequently refused to honor that claim, we would be hard-pressed not to find a violation of the statute. Here, JWA has not made such a claim. Instead, JWA claims the statute, in effect, imposes a duty on Nissan to: 1) determine what JWA's retail rates are; 2) examine the claim submitted by JWA to determine whether JWA is charging Nissan the correct amount; and 3) review the thousands of claims JWA has previously submitted and Nissan has paid to perform steps 1 & 2, and then send JWA a check for the difference.

Although we know of no Ohio cases addressing the application of section 4517.52, several states have enacted legislation that is similar. *See* Cal. Veh.Code § 11713.1 (West 1996); Fla. Stat. Ann. §§ 320.327, 320.837 (West 1996); 815 Ill. Comp. Stat. Ann. § 710/6 (West 1996); Ky.Rev.Stat. Ann. § 190.046 (Banks–Baldwin 1996); Mich. Comp. Laws Ann. § 445.1577 (West 1996); N.Y. Veh. & Traf. § 465 (McKinney 1996); Pa. Stat. Ann. tit. 63, § 818.19 (West 1996). Apparently, such legislation is seen as promoting public welfare by counteracting the economic power of the automobile manufacturers, and purportedly correcting past abuses. *See Hal Artz Lincoln–Mercury, Inc. v. Ford Motor Co., Lincoln–Mercury Div.*, No. 91AP–1493, 1992 WL 246014 (Ohio App. 10 Dist. Sept. 24, 1992) (citing MacAulay, *Changing a Continuing Relationship Between a Large Corporation and Those Who Deal With it: Automobile Manufacturers, Dealers, and the Legal System*, Wis. L.Rev. 483, 740 (1965); Note, *State Motor Vehicle Franchise Legislation: A Survey and Due Process Challenge to Board Composition*, 33 Vand. L.Rev. 385, 385–420 (1980)).

The First Circuit, interpreting a similar Maine statute held:

In fact, if anything, the legislative history belies the Dealers' contention that the statute was amended to "protect" dealers. We think that an objective reading of the legislative history indicates the legislature decided that warranty reimbursement levels would be at retail rates, in order to prevent non-warranty customers from being charged prices much higher than the customary retail rates. Therefore, if anything, the statute was arguably meant to protect *non-warranty consumers* from inflated prices charged by dealers who are attempting to maintain their average profit margins in the face of a manufacturer's below-retail reimbursement rates.

*Acadia Motors, Inc. v. Ford Motor Co.*, 44 F.3d 1050, 1056 n. 9 (1st Cir.1995).

■ It is reasonable to assume, as the First Circuit has with regard to Maine's version of this statute, that the Ohio legislature sought to benefit all consumers by requiring the automobile manufacturers to reimburse dealers for parts at the same rate the dealers' retail customers paid, in the hope that manufacturers would, as a result, put pressure on the dealers to lower their rates. However, we are not persuaded, in the absence of an express pronouncement from the Ohio legislature, that the statute was intended to place the burden for determining the appropriate rates on the manufacturer. Rather, we interpret the statute as first requiring the dealer to present the appropriate claim to the manufacturer, and then requiring that the manufacturer pay the presented claim. "It is an axiom of judicial interpretation that statutes be construed to avoid unreasonable or absurd consequences." *State ex rel. Dispatch Printing Co. v. Wells*, 18 Ohio St.3d 382, 481 N.E.2d 632, 634 (1985).

We agree with the district court that JWA waived its right to retail payment on previously submitted warranty claims because it had failed to request payment at rates other than cost plus a 30% markup, the amount stated in the dealership contract. As between the parties, JWA was in a better position to know its own retail rates. Therefore, submission of a reimbursement claim to Nissan was a representation that the stated claim was JWA's retail rate; Nissan had a right to rely upon that representation.

## IV.

We **AFFIRM** the district court's grant of summary judgment in favor of defendant Nissan.