NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0937n.06

No. 14-3119

FILED
Dec 18, 2014
DEBORAH S. HUNT, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| KINGS DODGE, INC., | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE SOUTHERN DISTRICT OF |
| CHRYSLER GROUP, LLC, | ) | OHIO |
| | ) | |
| Defendant-Appellee. | ) | OPINION |
| | ) | |
| | ) | |

BEFORE:    BOGGS, SUTTON, and STRANCH, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** Kings Dodge, a car dealership, sued Chrysler, a car manufacturer, seeking an increase in its rate of reimbursement for warranty labor and parts pursuant to the Ohio's Motor Vehicle Dealer Act. This case presents an issue of statutory interpretation—the meaning of the term "rates" in Ohio Revised Code § 4517.52—which controls Chrysler's reimbursement payments to Kings Dodge. The district court granted summary judgment to Chrysler, holding that it did not violate the statute and that Kings Dodge failed to submit a particularized claim to Chrysler sufficient to put it on notice of Kings Dodge's request for an increased warranty-parts reimbursement rate prior to Spring 2013. We AFFIRM the grant of summary judgment to Chrysler.

## I.   BACKGROUND

The efforts of Kings Dodge to obtain an increase in its rate of reimbursement for warranty labor and parts from Chrysler are based on § 4517.52(B) of the Ohio Motor Vehicle Dealer Act (the "Act"), which provides that:

> Each [manufacturer] shall compensate each of its [dealers] for labor and parts used to fulfill warranty and recall obligations of repair and servicing at rates not less than the rates charged by the [dealer] to its retail customers for like service and parts for nonwarranty work.

Ohio Rev. Code Ann. § 4517.52(B) (2010).

Under the terms of the Dealer Agreements and Chrysler's Dealer Policy Manual, which govern the relationship between the parties, Kings Dodge is required to perform warranty service for all Chrysler products and is reimbursed for such work by Chrysler.  Reimbursement is based on the multiplication of two measures: the dealer's warranty labor rate, which must be approved by Chrysler in advance; and the flat time that Chrysler assigns to each warranty repair, based on time studies it performs on its vehicles.  On the first measure, Chrysler compensates dealers only for their "actual effective retail rate," which is "the average hourly rate [the dealer] charge[s] for customer pay repairs."  If a dealer wishes to increase its warranty-labor rate, it must submit an application in compliance with the Dealer Policy Manual's requirements.  For many years, Kings Dodge has submitted thousands of warranty-reimbursement claims to Chrysler under these terms and has been reimbursed accordingly.

On August 30, 2011, Robert Reichert, the owner of Kings Dodge, wrote a letter to Maria Barrow, a Chrysler Service and Parts representative, citing Ohio Revised Code § 4517.52 and requesting that "all warranty repairs completed on and after August 20, 2011, be paid at the same rate as Kings Dodge charges its retail customers. $92.00 per hour for labor, and retail price for replacement parts."  At that time, Chrysler was reimbursing Kings Dodge at an hourly rate of

$77.00 for warranty-repair work and paying less than full retail price for replacement parts. Mr. Reichert made no specific request in his letter that Chrysler alter the times it allotted for warranty service.

On September 6, Gregory Jankowski of Chrysler responded to Mr. Reichert's letter and instructed him to follow the Dealer Policy Manual's procedures for requesting a "warranty[-]labor reimbursement increase." Mr. Jankowski also summarized Chrysler's requirements for establishing a dealer's "Labor Reimbursement Rate," which included the submission of: 200 consecutive retail repair orders charged to retail customers; the dealer's requested labor rate or average effective labor rate, whichever was less, on company letterhead; a line-item calculation listing all consecutive repair orders in the form of a spreadsheet, including services excluded from retail labor rate calculations; and dealership accounting copies of the repair orders submitted, not older than six months and highlighting dealer labor hours charged as well as the retail price. Mr. Jankowski testified that he did not understand the letter also to be requesting a change in Chrysler's warranty-parts reimbursement rates.

On September 30, Mark Pittman, a General Manager at Kings Dodge, submitted the required application, requesting that its warranty labor rate be increased to $84.78 per hour. Included with the request, which was written on company letterhead, was a packet including a labor rate market study of the effective labor rate of the five closest comparable car dealers, a spreadsheet listing 200 repair orders, and copies of the repair orders. The repair orders spreadsheet contained information regarding the type of repair, labor hours billed, cost of sale, retail charge, retail labor rate, customer coupons, and the actual retail order labor rate. These spreadsheets also listed information regarding the number of "labor hours billed" to retail customers, although the cover letter did not mention labor time as an issue. The spreadsheets did

not include any mention of costs or retail rates for parts; however, the individual repair orders contained information on retail rates charged for parts.

After reviewing these materials, Chrysler determined Kings Dodge's "average effective retail labor rate" and increased its warranty hourly labor rate to $84.07 per hour. The new reimbursement rate was determined by dividing the average amount Kings Dodge charged to a customer by the number of hours on the retail orders. Chrysler did not, however, alter the second component of the reimbursement calculation—the flat time it assigned to each warranty repair based on its internal time studies.

On November 18, Mr. Reichert emailed Mr. Jankowski, among other recipients at Chrysler, acknowledging the increase of the warranty labor rate to $84.07 and again citing Ohio Revised Code § 4517.52.

> The labor rate meets part of the requirement, but does not address the time allowed for nonwarranty work. Kings Dodge uses Motor/Alldata[1] to calculate labor time for retail nonwarranty work. As I'm sure you know, retail labor times are considerably higher than warranty times. For example, a water pump replaced on a 3.6 engine pays [.]8 hrs under warranty and 2.2 hrs at retail.[2] The repair orders we submitted to Chrysler for the labor rate increase reflect the retail times. In order to fully comply with Ohio law we must use the retail time for warranty repairs. Please advise your position with respect to this issue.

(R.43, Page ID 2562) No one at Chrysler ever responded to Mr. Reichert's email. Kings Dodge proceeded to submit warranty-reimbursement claims at the new hourly rate. Chrysler later increased Kings Dodge's warranty work reimbursement rate to $84.50, effective January 1, 2012, pursuant to the automatic annual labor rate increase provided for in the Dealer Agreements and Dealer Policy Manual. One year later and during this litigation, the warranty labor rate increased again, pursuant to the same provisions, to $86.19, effective January 1, 2013. Chrysler

---

[1]Kings Dodge bills hourly increments based upon the "flat times" or estimated repair times listed in the Motor/Alldata time guides rather than billing for the actual time required for a repair. The repair times for Chrysler vehicles suggested by Motor/Alldata are approximately twice as long as Chrysler warranty-repair times.

[2]At argument, counsel advised that the email intended to denote ".8" rather than "8" hours.

calculated all reimbursements throughout this time using as one factor the specific amount of time assigned by Chrysler to each warranty repair based on its time studies.

On June 7, 2012, Kings Dodge sued in federal district court, alleging that Chrysler committed multiple violations of Ohio Revised Code § 4517.52(B) and claiming unjust enrichment. It alleged that Chrysler failed to reimburse warranty service at the same labor rate Kings Dodge charged to its retail customers, that it failed to reimburse Kings Dodge for parts used in warranty repairs at rates charged to retail customers, and that it failed to allot the same amount of time for warranty repairs as Kings Dodge allotted when billing retail customers. Chrysler responded that Kings Dodge had presented insufficient evidence to support its allegations of inadequate compensation for labor time and parts, and that the statute could not have been violated because it contained no language pertaining to warranty-labor times.

In the spring of 2013, during the course of this litigation, Kings Dodge submitted another application for increased reimbursement to Chrysler, this time specifically requesting an increase in the then-current rate of cost plus 40% for reimbursement for warranty parts. Based on the set of repair orders submitted, Chrysler decided to increase Kings Dodge's parts reimbursement to dealer cost plus 59.13%, effective July 14, 2013.

The parties filed cross motions for summary judgment and the district court granted summary judgment to Chrysler. *Kings Dodge, Inc. v. Chrysler Group, LLC*, 2013 U.S. Dist. LEXIS 168756, at *53. The court held, as a matter of law, that § 4517.52(B) governs only the rates for labor and parts, and not the length of time allotted for warranty repairs. It also held: 1) that even if the statute did govern repair times, Kings Dodge had not submitted a particularized claim regarding repair times sufficient to put Chrysler on notice of its request for an increased reimbursement rate; 2) that Chrysler's Dealer Policy Manual governed warranty reimbursement

rates and specified the use of Chrysler's labor time, rendering the Motor/Alldata labor time irrelevant; and 3) that Kings Dodge had not submitted a particularized claim for an increase in parts reimbursement in its letter of August 30, 2011 that was sufficient to put Chrysler on notice of its request and thus a retroactive application of the parts-reimbursement increase granted in Spring of 2013 was not justified. Kings Dodge now appeals.

## II. ANALYSIS

### A. Standard of Review and Applicable Law

Appellate review of a district court's grant of summary judgment is de novo. *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014). Summary judgment is appropriate where there is no genuine dispute regarding any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In reviewing a motion for summary judgment, we must view all facts and inferences in the light most favorable to the non-moving party—in this case, Kings Dodge—and determine whether "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Bickley v. Dish Network, LLC*, 751 F.3d 724, 728 (6th Cir. 2014) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When resolving questions of state law in diversity cases, this court looks first to final decisions of the highest court of that state, in this case Ohio, and if there is no decision directly on point, the court must make an *Erie* judgment as to how Ohio's courts would decide the issue. *Griffin v. Finkbeiner*, 689 F.3d 584, 601 (6th Cir. 2012); *Jim White Agency Co. v. Nissan Motor Corp. in U.S.A.*, 126 F.3d 832, 835 (6th Cir. 1997). The federal court "must predict how the court would rule by looking to all the available data." *Griffin*, 689 F.3d at 601 (quoting *Allstate Ins. Co v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001)).

Ohio holds that the primary goal of statutory interpretation is to determine and give effect to the legislature's intent when it enacted the statute. *Sugarcreek Twp. v. City of Centerville*, 979 N.E.2d 261, 266 (Ohio 2012). First, Ohio courts look to the plain language of the statute and apply the statute as written when the meaning is unambiguous and definite. *Id.* at 267. "[W]here the language of a statute is clear and unambiguous, it is the duty of the court to enforce the statute as written, making neither additions to the statute nor subtractions therefrom." *Estate of Heintzelman v. Air Experts, Inc.*, 931 N.E.2d 548, 552 (Ohio 2010) (internal citations and quotation marks omitted).

When construing statutes, Ohio courts look to the rules of grammar and common usage. Ohio Rev. Code Ann. § 1.42; *Campus Bus Serv. v. Zaino*, 786 N.E.2d 889, 891 (Ohio 2003). In determining the "common, everyday meaning of a word, [Ohio courts] have consistently used dictionary definitions." *Campus Bus Serv.*, 786 N.E.2d at 891. Words and phrases that have "acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly." Ohio Rev. Code Ann. § 1.42; *see also Hoffman v. State Med. Bd. of Ohio*, 865 N.E.2d 1259, 1263-64 (Ohio 2007).

Where a statute's meaning is ambiguous, Ohio courts may engage in statutory interpretation, guided by the principles of construction found in Ohio Revised Code section 1.49, which permits a court to consider, among other matters: "the object sought to be attained"; "the circumstances under which the statute was enacted"; "the legislative history"; "the common law or former statutory provisions, including laws upon the same or similar subjects"; and "the consequences of a particular construction." Ohio Rev. Code Ann. § 1.49; *see also Ackison v. Anchor Packing Co.*, 897 N.E.2d 1118, 1127 (Ohio 2008).

**B. "Rates" in the Ohio Motor Vehicle Dealer Act**

There is very little Ohio case law concerning the meaning of "rates" in the Act and no case explicitly defining the requirements of § 4517.52(B) regarding dealer compensation. Ohio Revised Code Ann. § 4517.01 *et seq.* The definition of the term "rates" is debated by the parties: Kings Dodge argues that the term encompasses not only the amount charged for the technician's labor per hour, but also the number of hours allotted for a given repair—in sum, the total amount charged. Chrysler argues that "rates" refers only to the amount charged by a dealer for a technician's labor per hour, and that it does not refer to the number of hours allotted by the dealer or the manufacturer for a given repair.

Chrysler argues that the district court is correct in referring to the definition of "rate" supplied by Webster's Encyclopedic Unabridged Dictionary of the English Language (1989), which defines the term as a "certain quantity or amount of one thing considered in relation to a unit of another thing and used as a standard or measure: at the rate of 60 miles an hour." *Kings Dodge, Inc.*, 2013 U.S. Dist. LEXIS 168756, at *36. We find a similar definition in Webster's Third New International Dictionary 1884 (2002)—"rate" as a "quantity, amount or degree of something measured per unit of something else (as time)"—however, the same dictionary also contains a looser reference to "a reckoned value." Black's Legal Dictionary 1452 (10th ed. 2014), denotes "rate" as "proportional or relative value" as well as "an amount paid or charged for a good or service." The Oxford Dictionaries refer to both "a measure, quantity, or frequency, typically one measured against some other quantity or measure," as well as "a fixed price paid or charged for something, especially goods or services." *Oxforddictionaries.com* (last visited August 27, 2014). Kings Dodge argues that these latter, broader definitions apply.

There are clearly multiple common usages for "rate" that include both a narrower reference to a ratio, as well as a broader term for the total "amount" paid for an item or service. In the context of the statute—which requires a manufacturer to reimburse a dealer "for labor and parts used to fulfill warranty and recall obligations of repair and servicing at rates not less than the rates charged by the [dealer] to its retail customers for like service and parts"—the term "rates" also lends itself to application in two different settings: it applies both to labor, which can be quantified by a price per hour, and parts, which cannot be. Kings Dodge argues that "rate" must refer to the overall amount charged for a repair or part, while Chrysler argues that "rate" can mean only the sum charged on an hourly basis for labor. The plain language and its common usage provide support for each party's interpretation; therefore, we find the statute to be ambiguous.

As the Ohio statute does not provide a technical definition of "rate" in the context of the motor vehicle industry, we may turn to other sources, including the decisions of other courts interpreting similar statutes. *Hoffman*, 865 N.E.2d at 1263-64. Several states have motor vehicle dealer statutes that are similar, although not identical, to Ohio's, and a few courts in those jurisdictions have addressed the question of warranty reimbursement rates. *See* John P. Ludington, Annotation, *Validity, Construction, and Application of State Statutes Regulating Dealings between Automobile Manufacturers, Dealers, and Franchisees*, 82 A.L.R.4th 624 (1990). Here too, however, the case law falls on both sides of the issue, defining "rate" both narrowly and expansively.

Kings Dodge draws our attention to the Seventh Circuit, where Judge Posner interpreted a similar Illinois statute and suggested in dicta that "[t]he basic formula for reimbursement of the pure service (labor) component is an hourly wage rate times the number of hours the repair or

other servicing in question is estimated to take." *Kronon Motor Sales, Inc. v. Ford Motor Co.*, 41 F.3d 338, 340 (7th Cir. 1994). That language is not determinative, however, as even there an hourly wage "rate" is distinguished from the "formula" for calculating "pure service" that Judge Posner proposes. The *Kronon* court, moreover, did not address whether the statute required the manufacturer to accept the dealer's labor times or if it could impose its own standard times. Indeed, Ford paid its dealers according to its own repair times, as does Chrysler in this case, and Kronon did not challenge that practice.

Chrysler responds by citing an analogous case with similar facts, *Marler Ford Co., Inc. v. Ford Motor Co.*, 885 So.2d 654, 659-663 (La. Ct. App. 2004). There, a statute forbade manufacturers to "pay its dealers at a price or rate for warranty work that is less than that charged by the dealer to retail customers of the dealer for nonwarranty work of like kind," including parts and labor. *Id.* Despite this statutory language, the Louisiana Court of Appeals held that it was fair and reasonable for the manufacturer to use its own internal labor time standards to determine the rate, rather than those in the Motor guide used by the dealer. *Id.*

As Chrysler also points out, more recently the Virginia Court of Appeals reversed a decision of the Commissioner of Department of Motor Vehicles addressing the statutory provision that "[c]ompensation of a dealer for warranty . . . service . . . shall not be less than the amounts charged by the dealer . . . to retail customers for nonwarranty service." *Navistar, Inc. v. New Baltimore Garage, Inc.*, 731 S.E.2d 13, 18-20 (Va. Ct. App. 2012). Critical to the court's reasoning was the observation that the General Assembly had amended the clause by substituting "amounts" for "rates." *Id.* at 18. In light of this revised language, the court held that the manufacturer would be obligated to reimburse for warranty work using the same repair times charged to retail customers, as well as for items such as waste-disposal charges or computer-use

fees that were charged to such customers. *Id.* Chrysler argues that the substitution of "amounts" for "rates" in the Virginia statute was critical to the court's holding, making the case inapplicable to the Ohio statutory language at issue here.

Kings Dodge is most persuasive in pointing us to Maine, which has ample case law on this issue. There the pertinent statute required manufacturers to reimburse dealers for labor at "'the retail rate customarily charged by that franchisee for the same labor when not performed in satisfaction of a warranty.'" *Darling's v. Ford Motor Co.*, 719 A.2d 111, 115-16 (Me. 1998) (quoting 10 Me. Rev. Stat. § 1176 (2014)). The Supreme Judicial Court held, in response to questions certified from the United States district court, that the statute permitted dealers to use and be reimbursed for "flat rate pricing" according to their own estimations of labor hours, rather than obliging them to accept reimbursement calculated using the manufacturer's labor time estimates. *Id.*; *see also Darling's v. Daimler Chrysler Motors Co., LLC*, 2004 WL 1598682 (Me. Sup. Ct. May 10, 2004) (following *Darling's v. Ford*); *Nissan Motor Corp. in U.S.A. v. Darling's Honda/Nissan*, 1999 Me. Super. LEXIS 221 (1999) (same); *American Honda Motor Co. v, Darlings's Honda/Nissan*, 1997 Me. Super. LEXIS 225 (1997) (holding "rate" to encompass total amount charged for labor, not merely hourly labor costs). In coming to this conclusion, the *Darling's* Court cited legislative history indicating that the Legislature was concerned that manufacturers used their "superior bargaining power to reimburse dealers at artificially low prices for warranty repairs," and the statutory requirement that the dealer post its labor rate "'in a place conspicuous to its service customer.'" *Darling's*, 719 A.2d at 115-16. No such legislative history exists here, Chrysler argues. Indeed, as the case law in other jurisdictions is persuasive on both sides of this issue, we turn to consider the full context and history of the Ohio statute, which we find to be determinative.

## C. The Statutory History of Section 4517.52

The statutory history of § 4517.52 provides supports for Chrysler's position. As the district court points out, when § 4517.52 was amended in 1987, key language specifying that reimbursement for warranty labor and parts take into account labor times was omitted.

The original version of the statute, enacted in 1979, provided as follows:

A) Each [manufacturer] shall adequately and fairly compensate each of its [dealers] for labor and parts used to fulfill warranty and recall obligations of repair and servicing. Each [manufacturer] shall file a copy of its warranty and recall reimbursement schedules or formulas with the motor vehicle dealer board. The schedules or formulas shall be reasonable for the warranty and recall work, reimbursement procedures and all other conditions of such obligations. The reasonableness of the schedules or formulas shall be subject to the determination of the board, when a [dealer] or dealer organization files a notice of protest with the board.

B) In determining the adequacy and fairness of a [manufacturer's] warranty and recall reimbursement schedules or formulas, the principal factors to be considered by the board shall be the prevailing wage rates being paid by the franchisee in the community in which the franchisee is doing business; except that the compensation of a franchisee for warranty and recall service and parts shall not be at less than the rates charged by the franchisee to its retail customers for like service and parts for nonwarranty work. The schedules or formulas shall include a reasonable allowance of time for the diagnosis and performance of repairs by a technician of ordinary skill.

Ohio Rev. Code Ann. § 4517.52 (1979) (current version at Ohio Rev. Stat. Ann. § 4517.52(B) (2010)).

In contrast, the pertinent section of the current statute was amended in 1987 and 2010, in the latter instance adding language that precedes and succeeds the language at issue in this appeal. The full 2010 version provides:

A) Each [manufacturer] shall fulfill warranty and recall obligations of repairing and servicing motor vehicles, including all parts and components manufactured for installation in any motor vehicle.

B) Each [manufacturer] shall compensate each of its [dealers] for labor and parts used to fulfill warranty and recall obligations of repair and servicing at rates not less than the rates charged by the [dealer] to its retail customers for like service and parts for nonwarranty work.

C) Division A of this section shall not apply to [manufacturers] or [dealers] who deal in recreational vehicles.

Ohio Rev. Code Ann. § 4517.52. As Chrysler points out, the earlier version of the statute made a distinction between "wage rates" and a reasonable "allowance of time" to perform a given repair; the 1987 amendments omitted these references. Moreover, the same legislature retained similar language in the succeeding section, addressing the delivery of new vehicles. That provision calls for a compensation schedule that "shall be reasonable with respect to the time and compensation allowed," with the presumption that a schedule is unreasonable if it does not compensate the dealer at its "customary retail labor rate for the actual time required by a technician of ordinary skill to perform" the necessary work. Ohio Rev. Code Ann. § 4517.53.

An interpreting court should avoid reading deleted language back into the statute, and should "presume that the amendments were made to change the effect and operation of the law." *Kings Dodge, Inc.*, 2013 U.S. Dist. LEXIS 168756, at *33 (citing *Lynch v. Gallia Cnty. Bd. of Commrs.*, 680 N.E.2d 1222, 1224 (Ohio 1997)). A legislature will be considered to "act intentionally and purposely when it includes particular language in one section of a statute but omits it in another." *NACCO Indus., Inc. v. Tracy*, 681 N.E.2d 900, 902 (Ohio 1997).

Tenets of statutory construction suggest that Chrysler's reading of the statute is appropriate. It should be noted, however, that there is legislative history that is favorable to Kings Dodge, and more in keeping with the remedial purpose of this and similar statutes. *See New Motor Vehicle Bd. Of California v. Orrin W. Fox Co.*, 439 U.S. 96, 101-02 (1978) (observing that the "disparity in bargaining power between manufacturers and their dealer prompted Congress and some [twenty five] states to protect retail car dealers from perceived abusive and oppressive acts by the manufacturers"); *Liberty Lincoln-Mercury v. Ford Motor Co.*, 134 F.3d 557, 565 n.6 (3rd Cir. 1998) (holding that an analogous New Jersey statute protected dealers and that the resulting rule "recognizes the unique hardships associated with warranty

losses due to the dealer's lack of control over the terms of warranty transactions"); *Jim White Agency Co.*, 126 F.3d at 836 (describing § 4517.52 as legislation "promoting public welfare by counteracting the economic power of the automobile manufacturers, and purportedly past abuses"); *Acadia Motors, Inc. v. Ford Motor Co.*, 44 F.3d 1050, 1056 (1st Cir. 1995) (observing that the legislature explained that such statutes address the situation in which "non-warranty customers have subsidized automakers who were unwilling to pay the fair and full price for repairs made necessary when their automobiles failed to meet warranty standards"); *Earl Evans Chevrolet, Inc. v. Gen. Motors Corp.*, 598 N.E.2d 1187, 1193 (Ohio Ct. App. 1991) (describing § 4517.52 as "remedial and … therefore to be liberally construed to promote" remedies and means dealers who have been mistreated by manufacturers). These cases present strong policy arguments favoring the position of Kings Dodge. Even so, such concerns are for legislative determination, and the evidence of the amendments made by the legislature in 1987 supports Chrysler's position. The rules of statutory construction lead us to hold that Chrysler's warranty reimbursement policy does not violate § 4517.52 as it is currently written.

### D. Kings Dodge's Particularized Claims for Reimbursement

Finding no violation of § 4517.52(B), we do not reach Kings Dodge's claim regarding the sufficiency of its actions to obtain relief under § 4517.52 for Chrysler's refusal to reimburse Kings Dodge for the total hours it allotted for warranty repair work. Under the terms of the Dealer Agreements and Dealer Policy Manual, Chrysler has the right to determine the length of time allotted for warranty repair reimbursements. However, because the statute governs Chrysler's reimbursement for warranty parts, we will address Kings Dodge's argument that its August 30, 2011 letter placed Chrysler on notice of its request for an increase in the reimbursement rate for parts.

The Motor Vehicle Dealer Act, of which § 4517.52 is a part, has been interpreted in the Sixth Circuit as "requiring the dealer to present the appropriate claim to the manufacturer, and then requiring that the manufacturer pay the presented claim." *Jim White Agency Co.*, 126 F.3d at 836. With regard to requests for increased reimbursement rates for parts used in warranty repairs, the district court for the Northern District of Ohio has held that a plaintiff

> must prove, by a preponderance of the evidence, that: (1) Defendant reimbursed Plaintiff for parts used in warranty repairs at a rate that is less than Plaintiff's retail rate for parts used in nonwarranty repairs; (2) Plaintiff informed Defendant that it believed that Defendant was not reimbursing it for parts used in warranty repairs at its retail rate for like parts; and (3) Plaintiff provided reasonable verification of its claimed retail rate for like parts to Defendant before filing a legal action claiming that Defendant violated Section 4517.54

*R&R, Inc. v. Volvo Trucks N. Am., Inc.*, No. 4:06cv287, 2007 U.S. Dist. LEXIS 13583, at *10 (N.D. Ohio Feb. 28, 2007).

We find that in the Fall of 2011 Kings Dodge did not present Chrysler with an "appropriate claim" regarding parts reimbursement practices that was sufficient to justify retroactive payment of the parts reimbursement rate agreed to in the Spring of 2013. *Jim White Agency Co.*, 126 F.3d at 836. In Mr. Reichert's letter of August 30, 2011, Kings Dodge noted that it wished to be paid at retail rates for all warranty repairs and that it charged "retail price for replacement parts." However, when Kings Dodge submitted its materials to Chrysler in September, 2011, the accompanying letter made no reference to reimbursement rates for parts and only requested a warranty labor rate increase to $84.78 per hour. Mr. Reichert's email of November 18, 2011 also fails to address the issue of reimbursement for parts used in warranty work.

Only in the Spring of 2013, during the pendency of this litigation, did Kings Dodge follow the procedures in Chrysler's Dealer Policy Manual—analogous to those for obtaining a

warranty labor reimbursement increase—and submit another set of repair orders to specifically request an increase in the reimbursement rate for parts. At that point, Chrysler increased its reimbursement rate to dealer cost plus 59.13%, effective July 14, 2013. Although Kings Dodge has demonstrated that Chrysler's reimbursement rate was below the retail rate for parts used in nonwarranty repairs, Kings Dodge has not submitted evidence proving, by a preponderance, that it presented a particularized claim to Chrysler requesting an increase in its warranty parts reimbursements, or that it provided Chrysler with "reasonable verification" of its claimed retail rate prior to its submissions in the Spring of 2013. *R&R, Inc.,* 2007 U.S. Dist. LEXIS 13583, at *10. The claim of Kings Dodge for retroactive reimbursement fails.

### III.    CONCLUSION

For the reasons explained above, we AFFIRM the district court's grant of summary judgment for Chrysler regarding both the interpretation of Ohio Revised Code § 4517.52(B) and the failure of Kings Dodge to state a sufficiently particularized claim to justify payments prior to the increase granted in Spring 2013.