<u>NOT RECOMMENDED FOR FULL-TEXT PUBLICATION</u>
File Name: 15a0127n.06

Case No. 14-3543

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Feb 12, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| FRANKLIN PARK LINCOLN-MERCURY, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE NORTHERN DISTRICT OF |
| | ) | OHIO |
| FORD MOTOR COMPANY, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

BEFORE: BATCHELDER, MOORE, and SUTTON, Circuit Judges.

SUTTON, Circuit Judge. A turf war between two Lincoln-Mercury car dealerships in Toledo, Ohio, apparently prompted this dispute. One of the dealerships, Franklin Park Lincoln-Mercury, saw its hopes to dominate the luxury-car market in Toledo slip away when Ford Motor helped its competition merge with a nearby Ford dealership. That led to this lawsuit, in which Franklin Park claimed that Ford acted in bad faith in violation of the Ohio Motor Vehicle Dealer Act. The district court disagreed and granted summary judgment for Ford. We affirm.

I.

For many years the Toledo luxury-car market included two stand-alone Lincoln-Mercury dealerships: Franklin Park and Rouen. For many years Franklin Park told Ford Motor

Company, who owns the Lincoln and Mercury brands, that Toledo could support only one of the two franchises—and that Franklin Park should be it.

Rouen is no more, but its disappearance from the market did not happen in the way Franklin Park had hoped. In 2007, Rouen's owner, Michael Rouen, received a lucrative offer to sell the real estate underlying his Lincoln-Mercury dealership. He planned to accept the offer, which would require him to sell the franchise or move it. Rouen first asked Ford if he could move his Lincoln-Mercury operation into his Mitsubishi dealership next door, but Ford said no. With nowhere to move the franchise, Rouen opted to sell it. He found a potential buyer in Brondes Ford, a dealership a half a mile down the road.

News of a potential sale soon reached Rouen's crosstown rival. Franklin Park confronted Ford and asked if the rumors were true. Ford neither confirmed nor denied them. Franklin Park gave Ford an ultimatum: either block the Rouen-Brondes merger (thus putting Rouen out of business) or find someone to purchase Franklin Park.

Ford did not stop the sale and indeed ultimately facilitated it. The car company wanted to keep two Lincoln-Mercury dealers in Toledo, as market studies revealed that doing so would lead to greater profits and improved customer convenience. When Brondes Ford balked at Rouen's asking price and Rouen's future seemed in peril, Ford came to the rescue, sealing the deal by paying $180,000 of the price tag and offering $250,000 to update Brondes' facilities. The sales agreement permitted Brondes to operate the Lincoln-Mercury franchise on Rouen's property until the Ohio Board of Motor Vehicles approved an address change to Brondes' location. Curiously, a separate letter of understanding suggested that Brondes would operate there only for one day. Brondes apparently worked out of the Rouen dealership for less than a

week before moving the franchise into its Ford dealership. Only after the move did Franklin Park receive formal notice of the merger.

Franklin Park was not happy. It filed a protest about the merger with the Ohio Motor Vehicle Dealer Board. In its view, the relevant car-dealer law permitted it to protest Rouen's relocation for lack of good cause since both dealers sold the same brand of car and stood less than ten miles apart. Ohio Rev. Code §§ 4517.50(A), 4517.57(C). Not so, the Board determined, because the relocation fell within a statutory exception. If the relocating dealership moves less than one mile from its original location, the statute says, no one gets protest rights, even within a ten-mile radius. And "[t]he distance between the [Rouen] location and the [Brondes] location," the Board explained, "is less than a mile." R. 21-9 at 7; *see* Ohio Rev. Code § 4517.50(C)(1). Franklin Park appealed the decision to the state courts but to no avail. *See Fleisher v. Ford Motor Co.*, No. 09AP-139, 2009 WL 2374554, at *4 (Ohio Ct. App. Aug. 9, 2009), *appeal denied*, 918 N.E.2d 525 (Ohio 2009) (table).

Meanwhile, Franklin Park filed this lawsuit in federal court. Only one of its claims remains: that Ford "fail[ed] to act in good faith" in violation of the Ohio Motor Vehicle Dealer Act when it "desired, facilitated, underwrote, and ultimately caused the Rouen-Brondes transaction, over Franklin Park's repeated objections." Appellant's Br. at 28; *see* Ohio Rev. Code § 4517.59(1). The district court dismissed the claim on technical grounds, but we reversed. *See Franklin Park Lincoln-Mercury, Inc. v. Ford Motor Co.* (*Franklin Park I*), 530 F. App'x 542, 544 (6th Cir. 2013). On remand, the district court granted summary judgment for Ford. *See Franklin Park Lincoln-Mercury, Inc. v. Ford Motor Co.* (*Franklin Park II*), No. 3:09-CV-792, 2014 WL 2114665, at *9 (N.D. Ohio May 16, 2014). Franklin Park appeals.

II.

Franklin Park claims the district court erred by applying the wrong legal standard for determining good faith under the Ohio Motor Vehicle Dealer Act. Invoking our decision in *Jim White Agency Co. v. Nissan Motor Corp.*, 126 F.3d 832 (6th Cir. 1997), the district court ruled that Ford's decision to support the Rouen-Brondes merger did not violate the Act's good faith requirement because the choice was not "commercially unjustifiable." *Franklin Park II*, 2014 WL 2114665, at *2. No error occurred.

The Dealer Act requires vehicle manufacturers like Ford "to act in good faith" toward their dealerships. *See* Ohio Rev. Code § 4517.59(A)(1). "Good faith," the Act says, is "honesty in the conduct or transaction concerned and the observance of reasonable commercial standards of fair dealing in the trade . . . , including, but not limited to, the duty to act in a fair and equitable manner." *Id.* § 4517.01(BB). This definition cross-references the definition of "good faith" under Article 1 of Ohio's version of the Uniform Commercial Code. *See id.* At the time of the Rouen-Brondes deal, the UCC defined good faith as "honesty in fact in the conduct or transaction occurred." *Id.* § 1303.01(S) (West 2007).

*Jim White* applied the Dealer Act's good faith standard. In the absence of guidance from the Ohio Supreme Court, *Jim White* looked to Ohio cases interpreting the UCC Article 1 definition. 126 F.3d at 834. Based on that survey, it concluded that the Dealer Act forbids manufacturers only from treating their dealers in "commercially unjustifiable" ways. *Id.* (quoting *Master Chem. Corp. v. Inkrott*, 563 N.E.2d 26, 31 (Ohio 1990)).

*Jim White*'s interpretation of good faith under the Dealer Act—whether right, wrong, or somewhere in between—binds later panels of this Court addressing the same issue until: (1) the Sixth Circuit overrules *Jim White* en banc, (2) "an intervening and binding change" in Ohio law

occurs, or (3) Ohio courts "expressly indicate[]" *Jim White* went astray. *Bennett v. MIS Corp.*, 607 F.3d 1076, 1095 (6th Cir. 2010). *Jim White* has never faced en banc review, and no Ohio court has disapproved of its reasoning. The Ohio legislature, it is true, amended the UCC Article 1 definition of good faith in 2011 by adding a fair-dealing element, but that amendment does not apply retroactively to the 2008 Rouen-Brondes merger. 2011 Ohio Laws 9, sec. 3. *Jim White* and its commercial-justification standard remain the governing standard.

Franklin Park points to an intervening change to the definition of good faith, but it is a phantom. Invoking the official UCC commentary, the dealership submits that the 2011 addition of the fair-dealing element to Article 1 good faith "merely confirms what has been the case for a number of years." Ohio Rev. Code § 1301.201 cmt. for 2011 revision. If fair dealing has been an element of good faith *for years* as of 2011, the argument goes, fair dealing must have been an element of good faith in 2008. And that means, the argument concludes, that a fairness standard, not *Jim White*'s commercial-justification standard, applies to determine whether Ford acted in bad faith.

Franklin Park misreads the UCC commentary. It does not say the meaning of the Article 1 definition changed; it says everything around Article 1 changed while the Article 1 definition stayed the same. Article 1 provides default definitions of terms the UCC commonly employs (like good faith), which are displaced only by definitions specific to other Articles. Ohio Rev. Code Ann. § 1301.201(A). Over time, the commentary indicates, the Ohio legislature enacted Article-specific definitions of good faith that included a fair-dealing element such that, as of 2011, the default definition in Article 1 applied to just two of the UCC's nine Articles. Hence the 2011 update to Article 1. What happened outside of Article 1, however, makes no difference here. The Ohio Motor Vehicle Dealer Act references only the Article 1 definition of good faith.

And until 2011, that definition stayed the same, no matter how good faith was changing in Articles 2 through 9. What we are left with is this: The UCC Article 1 definition of good faith on which *Jim White* relied did not change before the Rouen-Brondes merger in 2008. That reality defeats Franklin Park's argument and supports the district court's decision.

III.

Franklin Park separately argues that the district court improperly granted summary judgment because "there is enough evidence" of Ford's bad faith "such that a jury is required." Appellant's Br. at 30. The benchmark for this argument is a familiar one. The district court properly granted summary judgment to Ford if no reasonable jury could find that Ford's actions were commercially unjustifiable even after giving Franklin Park the benefit of all reasonable fact inferences from the record. Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Jim White*, 126 F.3d at 834.

*Franklin Park I* goes a long way toward resolving this argument. There, we considered whether Ford's support of the Rouen-Brondes merger amounted to a "predatory practice" under the Dealer Act. *See* Ohio Rev. Code § 4517.59(A)(15); 530 F. App'x at 550. Franklin Park argued that Ford was trying to put it out of business but had no direct evidence backing up its allegation. Never mind, Franklin Park argued: The circumstances alone permitted an inference of predatory intent. We disagreed. That inference was not reasonable, we held, because Ford had a "legitimate . . . business reason" for supporting the Rouen-Brondes merger: Two viable dealerships will make more money for Ford than one. 530 F. App'x at 550.

That insight prompts a similar conclusion here. Ford wanted to keep two Lincoln-Mercury dealerships in Toledo to improve its overall sales. That by itself is an acceptable commercial justification for Ford's support of the Rouen-Brondes merger. But it is not the only

6

one. Ford also felt that having two dealerships would make customers happier than one because the two locations would facilitate repair and other dealership visits by customers. Nor has Franklin Park any direct evidence of bad faith. As the district court found the first time around, and as is still true today, "There is absolutely no evidence in the record to support the charge that [Ford] wanted to drive [Franklin Park] out of the Toledo market." *Franklin Park Lincoln-Mercury, Inc. v. Ford Motor Co.*, No. 3:09-CV-792, 2011 WL 5361738, at *6 (N.D. Ohio Oct. 31, 2011). No emails, no letters, no affidavits—nothing at all shows that Ford's conduct was motivated by a bad faith effort to harm Franklin Park. With two legitimate business rationales to support Ford's actions and with no evidence of bad faith conduct by Ford, a jury could not reasonably infer bad faith here.

Franklin Park counters that one key fact and two new affidavits permit an inference of bad faith. The dealership sees bad faith in the fact that the letter of understanding permits Brondes to operate the Lincoln-Mercury franchise at Rouen's location for a single day. It claims that Ford structured the deal so that Rouen would technically move less than a mile—at least for a day—thus triggering the one-mile exemption for dealer protest rights and avoiding a costly protest proceeding. But that does not make sense. Brondes Ford *already* sat just a half mile away from Rouen Lincoln-Mercury. That means Franklin Park would not have had protest rights anyway. We cannot infer bad faith from an action that everyone knew could not possibly harm Franklin Park under this feature of state law.

Nor do the affidavits of Franklin Park President Robert Fleischer and the dealership's expert witness, Dr. John Matthews, save Franklin Park's case. Fleischer's affidavit at most shows that *he* inferred bad faith from the circumstances surrounding the deal. Whether that inference is reasonable is a legal conclusion. "That [Franklin Park's] president would reach a

7

different *legal* conclusion than the district court is not sufficient to defeat a motion for summary judgment." *FRC Int'l, Inc. v. United States*, 278 F.3d 641, 643 (6th Cir. 2002). Dr. Matthews for his part states that "a single Lincoln store in Toledo would be sufficient to penetrate the market" and that "the Toledo market would be better served by one store." R. 106-7 at 3–4. Maybe so. But that opinion does not support the inference he attempts to draw—that the Rouen-Brondes deal was done in bad faith and was neither "commercially reasonable" nor "justifiable." *Id.* at 9. That Ford and Dr. Matthews have a different take on what would be the best business plan for Toledo—two luxury-car dealerships or one—does not suffice to create a cognizable claim of bad faith. Even on its own terms, moreover, the Matthews' affidavit has flaws. Rich on undisputed facts and conclusions, it displays scant analysis. "Simply having experts restate general facts and announce legal conclusions without any analysis does not create a genuine issue of material fact." *Doe v. Magoffin Cnty. Fiscal Court*, 174 F. App'x 962, 974 (6th Cir. 2006).

Franklin Park offers one other reason for reversing the district court. "That there is a business reason, or even several reasons, for conduct," it says, "cannot mean that the conduct is automatically commercially justifiable." Reply Br. at 5. True enough. But neither can it be true that every allegedly commercially unjustifiable action by a car company or dealer prompts a jury trial so long as the claimant identifies business reasons for *not* taking the course of action of the defendant. Commercial unjustifiability is a proxy for bad faith. One does not show bad faith merely by identifying a competing business plan. One must show that the plan adopted by the defendant did not make sense even on its own terms. That was not true here, as our prior opinion confirmed: "Ford made a business decision in what it perceived to be in its own best interest. There is nothing in the record to indicate that it was anything more than that." *Franklin Park I*,

530 F. App'x at 551. This is not a case in which Ford took an unusual or for that matter draconian action for a nonexistent benefit. It merely consolidated two crosstown dealerships because it believed that keeping two Lincoln-Mercury dealers in the Toledo market best served its interests. That choice does not exceed the bounds of reason or create a fact dispute about whether its actions were commercially justifiable.

For these reasons, we affirm.